UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PATRICIA HAYES, as Executor of the Estate of Sherilyn Hayes,<br><br>     Plaintiff,<br><br>v.<br><br>TOWN OF DALTON, JEFFREY E. COE, Dalton Chief of Police, in his individual and official capacities, JOHN MARLEY, Dalton Police Officer, in his individual and official capacities, FRANK M. SPETH, III, Dalton Dispatcher, in his individual and official capacities, DYLAN BENCIVENGA, Dalton Police Officer, in his individual and official capacities, TOWN OF PERU, KYLE NUTTING, Peru Police Officer, in his individual and official capacities,<br><br>     Defendants. | Case No. 3:21-cv-30055-KAR |

MEMORANDUM AND ORDER REGARDING MOTIONS TO DISMISS BY DEFENDANTS
DALTON POLICE OFFICER JOHN MARLEY, TOWN OF PERU, AND PERU POLICE
OFFICER KYLE NUTTING IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES
(Dkt. Nos. 20, 39, 41)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

In the aftermath of her daughter Sherilyn's tragic suicide, Plaintiff Patricia Hayes

("Plaintiff") filed suit seeking damages from the Town of Dalton and members of its police

department, as well as from Sherilyn's fiancé, Kyle Nutting, who was employed as a police

officer by the Town of Peru, and the Town of Peru (collectively, "Defendants").  Plaintiff alleges

that Defendants were notified that Sherilyn intended to kill herself and their failure to intervene

to try to prevent her death violated Sherilyn's civil rights and various state laws.  Now pending

1

before the court are the motions to dismiss filed by Dalton police officer John Marley (Dkt. No. 20), the Town of Peru, and Nutting in his official capacity and personal capacity (Dkt. Nos. 39, 41).  The parties have consented to this court's jurisdiction (Dkt. No. 45).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court ALLOWS in part and DENIES in part Marley's motion, ALLOWS the motion of the Town of Peru and Nutting in his official capacity, and DENIES in part Nutting's motion to dismiss in his individual capacity.

## II.    BACKGROUND

Because the court is ruling on motions to dismiss, the facts are recited in the light most favorable to Plaintiff, the non-moving party.  *See Gargano v. Liberty Int'l Underwriters, Inc.,* 572 F.3d 45, 48 (1st Cir. 2009) (citing *Fitzgerald v. Harris,* 549 F.3d 46, 52 (1st Cir. 2008)). Tyler Hamilton called the Dalton police department's communications center on November 23, 2019, at approximately 6:16 P.M. to report that his "buddy [Nutting] and his girlfriend [Sherilyn] just got into an argument" concerning Nutting's alleged infidelity (Dkt. No. 1 ¶¶ 9, 11, 16, 20). Hamilton notified Dalton police dispatcher Defendant Frank M. Speth, III, that Nutting was a Peru police officer who had left his North Street residence and was having dinner with the Peru police chief, but Sherilyn remained at the apartment that she shared with Nutting (Dkt. No. 1 ¶¶ 12, 14, 20, 23, 24).  Hamilton indicated that Nutting "had '. . . been calling [him] and texting [him] saying that he's worried about [Sherilyn]'" who had threatened suicide during their argument (Dkt. No. 1 ¶¶ 18, 21).  Hamilton requested a "wellness check" and urged the police to "hurry" because Sherilyn had failed to respond when Hamilton knocked at her door (Dkt. No. 1 ¶¶ 15, 16, 17, 20).  After Hamilton reaffirmed that Sherilyn said she was going to harm herself, Speth told Hamilton that he would dispatch officers to her residence (Dkt. No. 1 ¶¶ 22, 23).

At 6:18 P.M., about two minutes after Hamilton's call came into the communications center, Speth dispatched Dalton police officers, Defendants Marley and Bencivenga, to Sherilyn's and Nutting's North Street residence (Dkt. No. 1 ¶¶ 24, 25).  Speth's broadcast identified the call as a "'domestic'" and asked the responding officers to call the communications center for additional information (Dkt. No. 1 ¶ 26).  Speth later indicated that he did not want to provide all of the information about a "domestic dispute" involving a police officer over an open radio channel (Dkt. No. 1 ¶ 28).

Marley told Speth that he was at the Dalton Police Department and would speak with Speth in the communications center (Dkt. No. 1 ¶ 27).  During his conversations with Speth, Marley allegedly learned that Nutting was a Peru police officer and that Hamilton had requested a well-being check because Sherilyn had threatened suicide (Dkt. No. 1 ¶¶ 30, 31).[1]  According to the Dalton police department's rules and regulations, any call for service that included a suicide threat required an immediate response (Dkt. No. 1 ¶ 32).

At 6:21 P.M., Marley called Bencivenga over the radio and instructed him to "'[j]ust stand by in the area'" of Sherilyn's apartment (Dkt. No. 1 ¶ 34).  Marley indicated that he was going to make a phone call and would "'update [Bencivenga] in a minute'" (Dkt. No. 1 ¶ 34).

Marley attempted to reach Nutting by phone (Dkt. No. 1 ¶ 39).  At 6:24 P.M., Marley called Peru police chief Jeffrey Henault in an attempt to determine Nutting's whereabouts (Dkt. No. 1 ¶ 40).  Nutting spoke to Marley on Henault's personal cell phone (Dkt. No. 1 ¶ 41). According to Marley, Nutting told him that during his and Sherilyn's "verbal argument," she made "a comment about wanting to hurt herself," but Nutting did not "think she was going to

---

[1] Marley's initial police report about the incident allegedly omitted the information about Sherilyn's suicide threat that he received from Speth (Dkt. No. 1 ¶ 44).

hurt herself" and "there was no need for police to conduct a well-being check based on [her] statements" (Dkt. No. 1 ¶¶ 42, 46).  Marley stated that Nutting told him that Sherilyn was "just upset" (Dkt. No. 1 ¶ 42).[2]  Later, Marley allegedly indicated that Nutting told him that he believed Sherilyn "'wanted to die'" (Dkt. No. 1 ¶ 48).

Based on Nutting's "opinion" that a well-being check was not necessary, Marley neither responded to Sherilyn's apartment nor directed Bencivenga to respond (Dkt. No. 1 ¶ 52).  Instead, Marley called Hamilton at 6:29 P.M. (Dkt. No. 1 ¶ 53).  Hamilton told Marley that he had knocked on Sherilyn's door for about twenty minutes, but she had failed to answer (Dkt. No. 1 ¶ 54).  In response to Marley's question, "so what you're asking us to do . . . is to go there and speak to her to make sure she's okay?", Hamilton responded, "I just don't want it to interfere with his [Nutting's] career" (Dkt. No. 1 ¶ 56).  Marley continued:

> [h]e's [Nutting's] not calling and asking us to do this.  So you're the caller.  So for us to go there and either force our way into that home or to take her into custody, we need someone to tell us that that's what they're asking us to do. . . .  [I]t just . . . doesn't work that way with us.  So we need you to INAUDIBLE you want us to go there and check on her or you're going to use some other means yourself to do that or we're going to go there and she doesn't answer the door, we're going to either break the door down or we're going to get . . . a key and go in and talk to her.[3]

(Dkt. No. 1 ¶ 56).  Hamilton agreed to return to Sherilyn's residence (Dkt. No. 1 ¶ 56).

After Marley's conversation with Hamilton, Marley used his personal cell phone to call Bencivenga and told him to remain outside the apartment complex (Dkt. No. 1 ¶ 62).  Neither Marley nor Bencivenga responded to Sherilyn's residence at that time (Dkt. No. 1 ¶ 63).

---

[2] Marley's initial report of the incident failed to mention his phone conversation with Nutting (Dkt. No. 1 ¶ 43).

[3] According to the complaint, it was "common knowledge within the Dalton police department that there [was] a key lock box at [Sherilyn's] North Street complex which contain[ed] a master key to all apartments" (Dkt. No. 1 ¶ 54).

Notwithstanding the lack of a response by the Dalton police, Speth closed out Hamilton's call for service at 6:50 P.M. (Dkt. No. 1 ¶ 69).

At 6:40 P.M., Hamilton informed Marley that he and Nutting were going to the apartment to "check on" Sherilyn (Dkt. No. 1 ¶¶ 64, 65).  Hamilton and Nutting discovered Sherilyn at approximately 7:00 P.M. and called the Dalton police to request emergency assistance "for a person who had just taken her life" (Dkt. No. 1 ¶¶ 70, 71).

An anonymous letter to a member of the Dalton Select Board about Dalton police officers' lack of response to Hamilton's call for service prompted the town to hire Tewksbury's former police chief to conduct an investigation (Dkt. No. 1 ¶¶ 76, 80).  Plaintiff alleges that Marley "attempted to intimidate other officers from cooperating with the investigation" (Dkt. No. 1 ¶¶ 80, 81).

The Dalton Select Board voted to terminate Marley's employment as a police officer in or about May 2020 (Dkt. No. 1 ¶ 77).  The board's decision was affirmed by an arbitrator in April 2021 (Dkt. No. 1 ¶ 78).[4]

Plaintiff's complaint, which she filed on May 7, 2021, makes the following claims against the Town of Dalton, Dalton police personnel, Nutting, and Nutting's employer, the Town of Peru:  denial of due process, in violation of 42 U.S.C. § 1983 (Count I); denial of equal

---

[4] A copy of the arbitrator's decision in the Dalton Police Patrol Officers Union's appeal of Marley's termination is attached to the complaint as Exhibit 1 (Dkt. No. 1-1).  While "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes," Fed. R. Civ. P. 10(c), "[a] court may take judicial notice of an opinion issued in a prior proceeding . . . 'only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.'"  *Henneberger v. Cty. of Nassau*, 465 F. Supp. 2d 176, 185 (E.D.N.Y. 2006) (quoting *Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 157 (2d Cir. 2006)).

protection, in violation of 42 U.S.C. § 1983 (Count II); "failure to protect/violation of 'special

duty'/violation of civil rights" (Count III); conspiracy by state actor, in violation of 42 U.S.C. §§

1985(2) and (3) (Count IV); failure to prevent the § 1985 violation (Count V); gross negligence

(Count VI); liability under Mass. Gen. Laws ch. 258 against the Town of Dalton (Count VII);

wrongful death, in violation of Mass. Gen. Laws ch. 229, § 2A (Count VIII); and conspiracy, in

violation of 42 U.S.C. § 1983 (Count IX).[5]  Defendants Marley, the Town of Peru, and Nutting

have moved to dismiss the claims against then pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. Nos. 20,

39, 41).  The Town of Peru and Nutting have also moved for entry of final judgments under Fed.

R. Civ. P. 54(b) (Dkt. Nos. 39, 41).  Plaintiff has opposed the motions (Dkt. Nos. 32, 47, 49). [6]

III.    STANDARD OF REVIEW

"A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a

claim." *Ngomba v. Olee*, CIVIL ACTION NO. 18-11352-MPK, 2020 WL 107969, at *2 (D.

Mass. Jan. 9, 2020).  In ruling on the motion, a court must "treat all well-pleaded facts in the

complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Fin.*

*Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 127 (1st Cir. 2019) (citing *Ocasio-Hernández v.*

*Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)).  "In order to survive a motion to dismiss under

Rule 12(b)(6), the plaintiff must provide 'enough facts to state a claim to relief that is plausible

on its face.'" *Ngomba,* 2020 WL 107969, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[5] Count III ("failure to protect/violation of 'special duty'/violation of civil rights") and Count IV
(§ 1985 conspiracy) are not directed at a particular Defendant or Defendants.  Counts I, V, VI,
and IX name all of the individual Defendants.  Count II (equal protection) and Count VIII
(wrongful death) are brought against "All Defendants."

[6] The Town of Dalton, Dalton police chief Coe, Dalton dispatcher Speth, and Dalton police
officer Bencivenga answered the complaint and, at this point, have not sought dismissal of the
claims against them (Dkt. Nos. 19, 24).

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"Although evaluating the plausibility of a legal claim 'requires the reviewing court to

draw on its judicial experience and common sense,' *Iqbal,* 556 U.S. at 679, the court may not

disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of

those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Twombly,* 550 U.S. at

556).  However, "labels and [legal] conclusions, and a formulaic recitation of the elements of a

cause of action . . . " are insufficient to "raise a right to relief above the speculative level."

*Twombly,* 550 U.S. at 555.  "Simply put, the court should assume that well-pleaded facts are

genuine and then determine whether such facts state a plausible claim for relief."  *Ngomba,* 2020

WL 107969, at *2 (citing *Iqbal,* 556 U.S. at 679).

IV.   Analysis

A.   **Claims Against Dalton Police Officer Marley**

1.   Alleged Civil Rights Violations Under 42 U.S.C. § 1983 (Counts I
     and III)[7]

---

[7] Although the complaint does not specify whether each claim is brought against a Defendant in his individual or official capacities or both, the heading of the complaint names Defendants in their individual and official capacities (Dkt. No. 1 at 1).  "When an officer is sued in his or her official capacity it is essentially a suit against the government entity for which he or she works." *Koltin v. City of Fall River*, CIVIL ACTION NO. 14-13749-NMG, 2015 WL 6504337, at *6 (D. Mass. Sept. 1, 2015), *rec. dec. adopted in part, rejected in part,* Civil Action No. 14-13749-NMG, 2015 WL 5749455 (D. Mass. Sept. 30, 2015) (citing *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)).  "The First Circuit has adopted a 'course of proceedings' approach to determining whether a suit is an individual or official capacity suit."  *Cocroft v. Smith*, 95 F. Supp. 3d 119, 128 (D. Mass. 2015) (quoting *Powell v. Alexander*, 391 F.3d 1, 22 (1st Cir. 2004)).  "'Under this test, rather than relying solely on the face of the complaint, the court looks to the substance of the pleadings and the course of the proceedings,' and considers factors such as 'the nature of the plaintiff's claims, whether compensatory and/or punitive damages have been requested, the nature of defenses raised, including the defense of qualified immunity, and the stage of the litigation.'"  *Hourihan v. Bitinas*, Civil Action No. 16-cv-11734-ADB, 2018 WL 10246994, at *3

Section 1983 imposes liability upon "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983.  "A claim under section 1983 has two essential elements:  (1) the conduct complained of must have been committed under color of state law, and (2) the conduct must have worked a denial of rights that are protected by the Constitution or laws of the United States."  *Gueits-Colón v. De Jesus*, 177 F. Supp. 2d 128, 134 (D.P.R. 2001) (citing *Martinez v. Colon,* 54 F.3d 980, 984 (1st Cir. 1995)).  As to the first essential element, there is no dispute that Marley was acting under color of state law on November 23, 2019. Plaintiff alleges that Defendants, acting under color of law, "violated Sherilyn's Fourteenth Amendment rights . . . to substantive due process by placing her in a known danger and enhancing the risk of death with deliberate indifference to her personal physical safety" (Dkt. No. 33 at 9).  Plaintiff's theory of substantive due process liability is based on the doctrine of a state-created danger (Dkt. No. 1 at 1 and ¶¶ 83-88, 96-99).

a.     *Substantive Due Process and the State-Created Danger Doctrine*

"In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property."  *Rivera v. Rhode Island*, 402 F.3d 27, 33–34 (1st Cir. 2005).  Because the loss of life is a protected interest, that element is not in

---

(D. Mass. June 27, 2018), *aff'd,* 811 F. App'x 11 (1st Cir. 2020) (quoting *Cocroft,* 95 F. Supp. 3d at 128).  For purposes of this opinion, the federal claims will be treated as claims against Marley and Nutting in their individual capacities.  *See id.*

dispute.  *See id* at 34.  "Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct."  *Id.*

Generally, "the Due Process Clause does not require the state to protect citizens from 'private violence' in whatever form, including suicide."  *Souza v. Pina*, 53 F.3d 423, 427 (1st Cir. 1995).  *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989) ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.").  However, "when the state creates the danger to an individual, an affirmative duty to protect might arise."  *Irish v. Fowler,* 979 F.3d 65, 73 (1st Cir. 2020), *cert. denied,* 142 S. Ct. 74 (2021) (citing *DeShaney*, 489 U.S. at 201).[8]

> In order to make out a state-created danger claim in the First Circuit, the plaintiff must establish:
>
> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
>
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
>
> (3) that the act or acts caused the plaintiff's harm; and
>
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.
>
>> (i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

---

[8] Plaintiff also points to the "special relationship" exception to the general rule that governments are not liable for private violence (Dkt. No. 1 ¶ 100).  The "special relationship" exception may apply if "the [s]tate takes a person into its custody and holds him there against his will."  *DeShaney,* 489 U.S. at 199-200.  Where Plaintiff has not alleged that Sherilyn was in custody, or even in the presence of any police officer acting in his official capacity before or at the time she committed suicide, the "special relationship" exception does not apply.  *See Ferreira v. City of E. Providence*, 568 F. Supp. 2d 197, 210-11 (D.R.I. 2008) ("The special relationship exception is a limited one.").

(ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

*Id.* at 75.

### b. *Qualified Immunity Framework*

Marley contends that he is entitled to qualified immunity on Plaintiff's state-created danger claims (Dkt. No. 21 at 5-10). "Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Castagna v. Jean,* 955 F.3d 211, 213 (1st Cir. 2020), *cert. denied,* 141 S. Ct. 896 (2020) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis omitted)). "When sued in their individual capacities, government officials like [Marley] are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time."'" *Id.* at 219 (quoting *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019) (en banc)). *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "Courts may analyze either part of the [qualified immunity] test first." *Castagna*, 955 F.3d at 219. The plaintiff bears the "'heavy'" burden of demonstrating the clearly established inquiry. *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (quoting *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015)).

### c. *Marley did not violate Plaintiff's statutory or constitutional rights.*

Plaintiff alleges that Marley's "affirmative action and/or lack of action[]" caused a state-created danger (Dkt. No. 1 at 1). Marley argues that, accepting as true the facts Plaintiff has alleged, she has not, as a matter of law, shown that he affirmatively acted to create or increase the danger to Sherilyn; and even if he had, on the facts as pled, her right to recovery under the state created danger theory was not clearly established in November 2019 (Dkt. No. 21 at 10-15).

To state a viable state-created danger claim, the complaint had to allege "that a state actor or state actors affirmatively acted to create or enhance a danger to [Sherilyn]." *Irish*, 979 F.3d at 75. Because the line between an affirmative act and an omission may be difficult to draw, in determining the affirmative act question, courts in other jurisdictions have analyzed whether a government official's alleged specific act placed the individual "in a position of relatively less safety than [he or she] enjoyed before the affirmative act." *Doe v. Round Valley Unified Sch. Dist.,* 873 F. Supp. 2d 1124, 1132 (D. Ariz. 2012) (citing *Kennedy v. City of Ridgefield*, 439 F. 3d 1055, 1062-63 (9th Cir. 2006)). If the person was less safe, the affirmative act element may be satisfied. *See id.* at 1132-33 (citing cases). *See also L.R. v. Sch. Dist. of Philadelphia,* 836 F.3d 235, 243 (3d Cir. 2016) ("Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo."); *Stiles ex rel. D.S. v. Grainger Cty.,* 819 F.3d 834, 854 (6th Cir. 2016) ("The ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it.").

Plaintiff has not identified any case from any jurisdiction where an individual's suicide that was not directly and intentionally provoked by a defendant police officer has been held to satisfy the intentional act requirement of the state-created danger doctrine, and the court has found none. [9] Plaintiff has alleged no facts from which it could be inferred that Marley's

---

[9] Marley's contention that he is entitled to qualified immunity because the law concerning the legality of a police officer's warrantless entry into a home in response to a threat of suicide was not clearly established in November 2019 is wholly unpersuasive (Dkt. No. 21 at 5-10). *See, e.g., Caniglia v. Strom,* 141 S. Ct. 1596, 1603-04 (2021) (Kavanaugh, J., concurring) ("The Court's Fourth Amendment case law already recognizes the exigent circumstances doctrine,

treatment of Sherilyn "gave rise to [her] suicidal inclination . . . when [s]he otherwise would not have had one." *Coscia v. Town of Pembroke,* 659 F.3d 37, 40 (1st Cir. 2011). So far as appears from the complaint, Marley did not communicate with Sherilyn and was not in her presence or near her apartment during the relevant time. Rather, Plaintiff alleges that Marley exacerbated the risk to Sherilyn by not complying with the Dalton police department's regulation mandating an immediate response to a call for a suicide threat, directing Bencivenga to stay out of Sherilyn's apartment, calling Nutting, and dissuading Hamilton from pressing his call for service (Dkt. No. 1 ¶¶ 32, 34, 42, 56, 62, 63). "[N]othing in the complaint suggests even in a conclusory way that [Sherilyn's] self-destructive tendency was intensified by state action, or that anything done or omitted by the police weakened any instinct for self-preservation and made [her] more dangerous to [her]self." *Coscia,* 659 F.3d at 40. It is not alleged that Marley's actions or inactions changed the status quo inside of Sherilyn's apartment. In these circumstances, courts in this and other jurisdictions have declined to find a violation of a decedent's substantive due process rights. *See*, *e.g.*, *id.; Reeves v. Town of Hingham,* Civil No. 19-11474-LTS, 2020 WL 759370, at *3 (D. Mass. Feb. 14, 2020) (plaintiffs "could not maintain a section 1983 claim for law enforcement officials' failure to prevent [their son's] tragic suicide."); *see also Cutlip v. City of Toledo,* 488 F. App'x 107, 115-16 & n.9 (6th Cir. 2012) ("[A]lthough a number of courts have considered the state-created danger doctrine within the context of suicide, the primary cases that have found or seriously entertained liability have involved the suicide of minors where school officials or

---

which allows an officer to enter a home without a warrant if the 'exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' [O]ne such recognized 'exigency' is the 'need to assist persons who are seriously injured or threatened with such injury.'") (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006) (citation omitted)).

police were in some way responsible.  Nearly all cases that considered the state-created-danger doctrine in the context of suicide have rejected liability on the merits . . . .") (citation omitted) (collecting cases); *Henderson v. City of Philadelphia,* No CIV. A. 98-3861, 1999 WL 482305, at *12 (E.D. Pa. July 12, 1999) ("In the absence of an act by the officers that changed the volatile circumstances which already surrounded [the decedent], they cannot be liable [for his suicide].").

Said another way, Marley's failure to provide assistance in response to Sherilyn's suicide threat does not satisfy the affirmative act element that is necessary to establish a state-created danger claim.  *See Wilson v. Gregory,* 3 F.4th 844, 858 (6th Cir. 2021) ("'failure to act is not an affirmative act under the state-created danger theory'") (quoting *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003)); *Doe v. Rosa,* 795 F.3d 429, 439 (4th Cir. 2015) (to establish § 1983 liability based on a state-created danger theory, "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."); *Hasenfus v. LaJeuness,* 175 F.3d 68, 73 (1st Cir. 1999) ("Where a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern."); *Round Valley Unified Sch. Dist.,* 873 F. Supp. 2d at 1133 ("there is no 'affirmative act' when a government official allows a dangerous situation to develop or continue without intervention – even if the official affirmatively chooses not to intervene."); *Bennett ex rel. Irvine v. City of Philadelphia*, Civil Action Nos. 03-5685, 05-0833, 2006 WL 1371189, at *10 (E.D. Pa. May 17, 2006), *aff'd,* 499 F.3d 281 (3d Cir. 2007) (state employee's failure to respond to a hotline report of abuse "does not give rise to a due process violation because 'indefensible passivity' and nonfeasance do not amount to a constitutional violation.") (citation omitted).  For the foregoing

reasons, the law does not allow this claim to go forward, notwithstanding the tremendous loss suffered by Plaintiff.

Where well-settled law bars Plaintiff's claim that Marley's actions were in violation of her substantive due process rights, the court does not need to reach the question of whether Marley violated a constitutional right that was clearly established in 2019. *Cf. Robinson v. Cook*, 863 F. Supp. 2d 49, 64 (D. Mass. 2012) (stating that where the court found no violation of the plaintiffs' constitutional rights, the court did not need to reach the question of qualified immunity). In any event, when Sherilyn died in November 2019, state-created danger liability for the suicide of someone who was not in custody was not clearly established. In September 2011, the First Circuit noted that the court "had been apprised of no case recognizing due process liability for suicide based on police conduct except for death during custody . . . ." *Coscia*, 659 F.3d at 39; *see also Hasenfus*, 175 F.3d at 72-74 (rejecting state-created danger liability for student's attempted suicide); *Ferreira*, 568 F. Supp. 2d at 210-12 (finding that police officers were not liable for the decedent's suicide under a state-created danger theory). In February 2020, shortly after Sherilyn's death, relying on *Coscia*, another session of this court noted the lack of precedent for imposing liability on police officers who allegedly failed to prevent the suicide of the decedent who was not in custody. *See Reeves*, 2020 WL 759370, at *3 (quoting *Coscia*, 659 F.3d at 39). Nor, as is set forth above, did the law in other circuits clearly establish that Marley's conduct violated Sherilyn's constitutional rights.

For the foregoing reasons, Marley's motion to dismiss is allowed as to Counts I and III.

## 2. Alleged Violation of Equal Protection Rights (Count II)

Plaintiff further alleges that Marley violated her right to equal protection by withholding police assistance because her domestic partner was a police officer (Dkt. No. 1 ¶¶ 90-94).

Marley contends that the complaint does not sufficiently allege that Sherilyn was treated differently from others who were similarly situated (Dkt. No. 21 at 18).[10]  As to Count II, the complaint states a viable claim.

"The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino,* 377 F.3d 1, 5 (1st Cir. 2004) (citation omitted).  "'[A]lthough there is no constitutional right to police protection,' the Fourteenth Amendment Equal Protection Clause does prohibit executive and law enforcement officials from 'selectively deny[ing] . . . protective services to certain disfavored minorities.'" *Barresi v. City of Boston*, 345 F. Supp. 3d 98, 104-05 (D. Mass. 2018) (quoting *Hayden v. Grayson,* 134 F.3d 449, 452 (1st Cir. 1998) (alterations in original)).  *See Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988) ("Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection.").

In claiming that Sherilyn was denied police assistance because Nutting was a police officer, Plaintiff proceeds under a class of one theory (Dkt. No. 1 ¶¶ 29, 61, 90, 91; Dkt. No. 33 at 18).  To plead a "class of one" equal protection claim, a plaintiff must allege "'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Zell v. Ricci*, 957 F.3d 1, 13 (1st Cir. 2020) (quoting *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (collecting cases)); *see also Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639-40 (1st Cir. 2013).  Plaintiff also needed to allege

---

[10] Marley did not raise qualified immunity with respect to this claim (Dkt. No. 21), and the court declines to consider the issue *sua sponte. See Montrond v. Spencer*, Civil Action No. 17-10505-ADB, 2021 WL 5040318, at *4 (D. Mass. Oct. 29, 2021) (the court declined to consider a qualified immunity defense on a motion to dismiss where the defendant failed to brief the issue adequately).

sufficient facts to show "'that the different treatment was based on a malicious or bad faith intent to injure.'" *Zell,* 957 F.3d at 13 (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)).

Accepting the complaint's allegations as true and drawing all reasonable inferences in Plaintiff's favor, she has adequately alleged that Marley acted with discriminatory intent by withholding assistance from Sherilyn when he would have responded appropriately to a call for assistance for a similarly situated individual who was not involved in a domestic confrontation with a police officer. *See Dalton v. Reynolds,* 2 F.4th 1300, 1311 (10th Cir. 2021) ("it is unlawful to provide less police protection to a sub-class of domestic violence victims, like those whose assailants were police officers with whom they had been in a domestic relationship.") (citing *Watson,* 857 F.2d at 694). Marley's failure to comply with a Dalton police department regulation requiring an immediate response to a suicide threat and his knowledge of Nutting's status as a police officer coupled with his apparent reluctance to provide police assistance to Sherilyn raise a reasonable inference that Marley treated Sherilyn differently from others who were similarly situated (Dkt. No. 1 ¶¶ 32, 38).[11] *See Nguyen v. City of Memphis,* Case No. 2:21-cv-2003, 2021 WL 5165683, at *6 (W.D. Tenn. Nov. 5, 2021), *appeal docketed sub nom Nguyen v. Boylan*, No. 21-6138 (6th Cir. Dec. 3, 2021) (denying motion to dismiss equal protection claim against officers who allegedly discriminated against decedent, who was the victim of domestic violence, by failing to follow department policies and requirements).[12]

---

[11] In addressing Marley's arguments, the court notes that Plaintiff did not attach the Dalton police department's domestic violence policy to her complaint, nor did she rely so heavily on its contents in her pleading that the court would be entitled to rely on the policy's provisions in ruling on this motion (Dkt. No. 21 at 3). *See Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013) (describing the "narrow exception" that permits a court to consider a limited number of extrinsic documents at the motion to dismiss stage).

[12] "Specific to this class-of-one arena, [the First Circuit has] said the 'plaintiff bears the burden of showing that [her] comparators are similarly situated in all respects relevant to the challenged

"[I]n the unusual setting of 'class [of] one' equal protection cases alleging unequal police protection, demonstrating that the unequal police protection had no rational basis requires a plaintiff to 'present evidence that the defendant deliberately sought to deprive [her] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position.'" *Shipp v. McMahon,* 234 F.3d 907, 916 (5th Cir. 2000), *overruled in part on other grounds by McClendon v. City of Columbia,* 305 F.3d 314 (5th Cir. 2002) (en banc) (quoting *Hilton v. City of Wheeling,* 209 F.3d 1005, 1008 (7th Cir. 2000)).  Plaintiff has adequately alleged that Marley withheld assistance from Sherilyn to avoid negatively impacting the career of a fellow police officer.  Such a motive has been found sufficient to support a viable equal protection claim.  *See id.* at 916-17 (plaintiff's evidence, which raised the possibility that her mother-in-law's hostility toward her influenced the level of protection plaintiff received from the police department because her mother-in-law was a deputy at the department and was "intimately involved" with the police department's responses to plaintiff's calls for protection from her police officer-husband, might be sufficient to establish a class-of-one unequal police protection claim); *Wright v. Vill. of Phoenix,* No. 97 C 8796, 2000 WL 246266, at *7 (N.D. Ill. Feb. 25, 2000) (a desire to protect fellow officers from domestic violence charges was a "personal, independent motive[]" that was "unconnected to . . . official police business.").

Marley's assertion that he had no such improper motive would require reading the allegations in the complaint in the light most favorable to him and is unavailing at this stage.  *See*

government action.'" *Zell,* 957 F.3d at 13 (second alteration original) (quoting *Gianfrancesco,* 712 F.3d at 640) (citations omitted)).  Where comparator information would logically be in the possession, custody, or control of the Dalton police department, such evidence must await development in discovery.

*Educadores Puertorriqueños en Acción v. Hernández,* 367 F.3d 61, 66 (1st Cir. 2004) ("State of mind, including motive and intent, may be averred generally" in a § 1983 complaint).

The complaint states a viable claim for a violation of Sherilyn's right to equal protection. Accordingly, so much of Marley's motion as seeks dismissal of Count II is denied.

3.   Alleged Conspiracy in Violation of 42 U.S.C. §§ 1985 and 1986
(Counts IV and V)

In Count V, claiming violations of 42 U.S.C. § 1985(2) and (3), Plaintiff relies on the second clause of § 1985(2), alleging that "Defendants conspired for the purpose of impeding, hindering, obstructing, or defeating, in various manners, the due course of justice in Massachusetts with intent to deny the Plaintiff the equal protection of the laws . . . ." (Dkt. No. 1 ¶ 102). *See* 42 U.S.C. § 1985(2).  However, Marley's memorandum in support of his motion to dismiss and Plaintiff's opposition to the motion limit their discussions to § 1985(3) (Dkt. No. 21 at 18-19; Dkt. No. 33 at 19-20).  Marley contends that the complaint falls short of alleging sufficient facts to show an agreement between Marley and other Defendants or that Marley acted with "discriminatory animus" (Dkt. No. 21 at 18-19).  The court agrees that the complaint fails to adequately allege an agreement among Defendants based on a cognizable invidiously discriminatory animus.

"Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to them by law." *Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021) (citing 42 U.S.C. § 1985(3)).  To present an adequate conspiracy claim under § 1985(3) a plaintiff must allege the existence of:

> (1) a conspiracy [of two or more persons], (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege. *See Griffin v.*

18

*Breckenridge,* 403 U.S. 88, 102 (1971).  In *Griffin,* the Supreme Court placed a gloss on these four elements, effectively adding a fifth requirement.  It construed the statute's references to "equal protection" and "equal privileges and immunities under the laws" to signify that a plaintiff may recover thereunder only when the conspiratorial conduct of which [s]he complains is propelled by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.*

*Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).  As to that last element, Plaintiff "must allege facts showing that (1) the defendants conspired against [Sherilyn] because of [her] membership in a class, and (2) the criteria defining the class are invidious." *Id.* at 4.

The complaint does not allege a conspiracy between two or more persons or invidious, class-based discriminatory animus.[13]  "[C]omplaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts." *Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir. 1977).  Plaintiff alleges that Defendants conspired to withhold assistance from Sherilyn in order to protect a fellow officer (Dkt. No. 1 ¶¶ 29, 61).  However, there are no facts alleged from which it could be reasonably inferred that Marley agreed with other Defendants to withhold assistance.  An agreement is "'a single plan the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" *Aubin v. Fudala,* 782 F.2d 280, 286 (1st Cir. 1983) (alteration in original) (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir. 1979)).

According to the complaint, Speth dispatched Marley and Bencivenga to Sherilyn's apartment approximately two minutes after Hamilton called for service and asked Speth to "hurry" because Sherilyn had threatened to harm herself (Dkt. No. 1 ¶¶ 17, 22, 24).  Thereafter,

---

[13] To the extent the complaint also alleges a § 1985(2) conspiracy claim, there is substantial overlap in the elements. *See Bolduc v. Town of Webster*, 629 F. Supp. 2d 132, 150–51 (D. Mass. 2009) ("There are . . . four elements of a § 1985(2) claim:  (1) a conspiracy between two or more persons, (2) to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in any State, (3) with invidiously discriminatory animus, (4) which results in injury to plaintiff.").

Marley, who was Bencivenga's supervisor, allegedly directed him to stand by while Marley

called Nutting and Hamilton (Dkt. No. 1 ¶¶ 34, 42, 52, 53).  After those phone conversations,

which are detailed in the complaint, Marley purportedly repeated the stand-by order to

Bencivenga (Dkt. No. 1¶¶ 62, 63).  Although the complaint sets out the conversations between

Speth and Marley, between Marley and Bencivenga, and between Marley and Nutting in detail,

there are no allegations that Defendants jointly discussed and agreed to withhold assistance to

protect Nutting's job (Dkt. No. 1 ¶¶ 30, 31, 34, 42, 62).  *See Parker v. Landry*, 935 F.3d 9, 18

(1st Cir. 2019) ("a plaintiff seeking to allege . . . a conspiracy must plausibly allege facts

indicating an agreement among the conspirators to deprive the plaintiff of her civil rights.").

The complaint further alleges that "Defendants, separately and collectively subsequently

conspired to conceal the events surrounding [Sherilyn's death]" by "intentionally deleting" or

omitting information from their police reports concerning "key events that occurred prior to

[Sherilyn's death]" (Dkt. No. 1 ¶¶ 73, 74).  Marley, however, is the only person who is alleged to

have omitted information from his initial incident report (Dkt. No. 1 ¶¶ 43, 44, 45).  Plaintiff's

failure to identify Marley's purported co-conspirators in the cover-up is fatal to this aspect of the

conspiracy claim.  *See Alston,* 988 F.3d at 578 ("Vague and conclusory allegations about persons

working together, with scant specifics as to the nature of their joint effort or the formation of

their agreement, will not suffice to defeat a motion to dismiss.").

Moreover, for purposes of § 1985(3) (or § 1985(2)), Plaintiff has not alleged that Sherilyn

was "a member of any defined class, let alone one defined by invidious criteria" (Dkt. No. 1 ¶¶

102, 103).  *Burbank v. Town of Hubbardston,* 146 F. Supp. 3d 402, 405 (D. Mass. 2015).  "[A]

class is cognizable for purposes of § 1985(3)'s class-based animus requirement only when it is

comprised of a distinctive and identifiable group.  For this purpose, distinctiveness connotes that

a reasonable person can readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not." *Aulson,* 83 F.3d at 5-6. Other courts have declined to find victims of domestic violence to be members of a protected class. *See Dornheim v. Sholes*, 430 F.3d 919, 924 (8th Cir. 2005) ("the term 'class' means something more than the group of people who share the common characteristic of being victims of domestic violence."); *Allison v. Shabazz*, No. C 14-04813 JSW, 2016 WL 2957121, at *7 (N.D. Cal. May 23, 2016) ("Plaintiff fails to allege that victims of domestic violence constitute a protected class."); *Rideau v. Jefferson Cty.,* 899 F. Supp. 298, 302 (E.D. Tex. 1995) (rejecting a class comprised of women seeking protection from domestic violence perpetrated by men who were also deputy sheriffs). These deficiencies require dismissal of the § 1985 conspiracy claims. Furthermore, without sufficient allegations of liability on Marley's part under § 1985, Plaintiff has no claim against him under § 1986. *See Maymí v. P. R. Ports Auth.*, 515 F.3d 20, 31 (1st Cir. 2008) ("absent a showing of conspiracy [under § 1985], [plaintiff] has no claim under § 1986, which extends liability to those who knowingly failed to prevent conspiracies under § 1985") (citing 42 U.S.C. § 1986. Consequently, Counts IV and V are dismissed with respect to Marley.

4.   Alleged 42 U.S.C. § 1983 Conspiracy (Count IX)

In Count IX, Plaintiff alleges in conclusory fashion that Defendants "conspired together to deprive [her] of evidence her [sic] procedural and substantive constitutional rights and are jointly liable" (Dkt. No. 1 ¶ 120).

To prove a conspiracy to violate § 1983, Plaintiff must show "'(1) an agreement between two or more state actors . . . (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Williams v. City of Boston*, Civil Action No. 10-10131-PBS, 2013 WL 1336584, *11 (D. Mass. March 14, 2013) (citation

omitted).  "[A] claim of conspiracy to deprive a plaintiff of civil rights will not survive a motion to dismiss if it makes conclusory allegations without making supporting factual assertions." *Diaz v. Devlin*, 229 F. Supp. 3d 101, 111 (D. Mass. 2017) (citing *Slotnick*, 560 F.2d at 33). Although "conspiracy is a matter of inference," *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008)*,* here too the complaint is devoid of facts that would support an inference that Marley and others had a "concrete agreement" to violate Sherilyn's right to equal protection. *Diaz,* 229 F. Supp. 3d at 111.  *See Hamilton v. Arnold*, 135 F. Supp. 2d 99, 103 (D. Mass. 2001), *aff'd,* 29 F. App'x 614 (1st Cir. 2002) ("the importance of proving an agreement to conspire is paramount").

To the extent Plaintiff alleges that Marley engaged in a § 1983 conspiracy to cover up the events surrounding Sherilyn's suicide by falsifying police reports after her death (Dkt. No. 1 ¶¶ 73, 74; Dkt. No. 33 at 19), in addition to failing to adequately allege an agreement, the complaint fails to state a viable claim because "[f]or such a claim to be successful, the cover-up must result in an independent constitutional violation . . . ."  *Watson v. Perez*, 168 F. Supp. 3d 365, 373 (D. Mass. 2016) (citations omitted).  "[A]n officer's failure to file a[n] [accurate] police report, in furtherance of an alleged conspiracy to cover-up wrong-doing, does not constitute an independent constitutional violation and therefore cannot support plaintiff's' cover-up conspiracy claim." *Correia v. Town of Framingham*, 969 F. Supp. 2d 89, 98 (D. Mass. 2013).  *See Jellyman v. City of Worcester,* 354 F. Supp. 3d 95, 100-01 (D. Mass. 2019) (dismissing § 1983 conspiracy claim that was based on police officers' alleged attempt to cover up their unlawful conduct as failing to show any constitutional deprivation that resulted from the alleged conspiracy).

For the foregoing reasons, Marley's motion to dismiss Count IX is allowed.

5.     <u>State Law Claims (Counts VI and VIII)</u>

Plaintiff alleges that Marley is liable for gross negligence (Count VI) and wrongful death (Count VIII).  "'Bringing a claim against a Town employee in his . . . official capacity equates to bringing a claim against the entity.'"  *Hourihan,* 2018 WL 10246994, at *8 (quoting *Saltzman v. Town of Hanson,* 935 F. Supp. 2d 328, 350 (D. Mass. 2013)).  Because the Town of Dalton, which was Marley's employer in November 2019, has not moved to dismiss, the court limits its discussion to individual liability for gross negligence and wrongful death.

Gross negligence is "an act or omission respecting [the] legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care."  *Altman v. Aronson*, 121 N.E. 505, 506 (Mass. 1919).  "'The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence.  Gross negligence is a manifestly smaller amount of watchfulness . . . than the circumstances require of a person of ordinary prudence.'"  *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 847 (Mass. 2008), *abrogated on other grounds by Doull v. Foster*, 163 N.E.3d 976 (Mass. 2021) (quoting *Altman*, 121 N.E. at 506).  "In evaluating whether a defendant's actions were grossly negligent, the court must consider the defendant's conduct as a whole. . . .  Thus, the question whether a party's conduct was negligent or grossly negligent involves a fact-based inquiry into the circumstances of the case."  *Szulik v. State St. Bank & Tr. Co.*, 935 F. Supp. 2d 240, 269 (D. Mass. 2013) (citing *Doe v. Cultural Care, Inc.*, Civil Action No. 10-11426-DJC, 2011 WL 4738558, at *3 (D. Mass. Oct. 7, 2011)).  The Massachusetts Wrongful Death statute, Mass. Gen. Laws ch. 229, § 2, provides in pertinent part that a "person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, . . . shall be liable in damages."  Mass. Gen. Laws ch. 229, § 2.

Reading the complaint in the light most favorable to Plaintiff, she alleges that Marley knew that Sherilyn had threatened to kill herself, knew (or should have known) that a prompt response was essential if police intervention was to do any good, did not respond to Sherilyn's apartment himself, and prevented Bencivenga from doing so.  He is alleged to have failed to comply with the relevant Dalton police regulation concerning responding to a call about a suicide threat and to have valued Nutting's interests over Sherilyn's life.  Marley's contention that he had no basis to enter Sherilyn's apartment on the information Speth gave him is unpersuasive.  The court cannot say, as a matter of law, that Marley's acts and omissions as alleged were not grossly negligent or willful, wanton, or reckless.  In the court's view, Marley has defenses to these claims that were not raised and are therefore waived for purposes of this motion.  *Cf. Montrond*, 2021 WL 5040318, at *4; *Latimore v. Trotman*, CIVIL ACTION NO. 14-13378-MBB, 2017 WL 3623159, at *10 (D. Mass. Aug. 23, 2017) ("As a final matter, because [defendant] does not develop his qualified immunity defense with sufficient specificity and detail, the defense is waived for purposes of this motion.").

### B. Claims Against Nutting In His Official Capacity, Claims Against The Town Of Peru, And Claims Against Nutting In His Individual Capacity[14]

#### 1. Federal Claims:  Alleged Violations of 42 U.S.C. §§ 1983 and 1985 (Counts I, II, III, IV, V, and IX)

Plaintiff contends that Nutting, acting in his official capacity as a Peru police officer, violated Sherilyn's constitutionally protected rights when he allegedly "used his authority as a police officer to dissuade Marley from going to [Sherilyn's home] for a wellness check" (Dkt.

---

[14] The claims against Nutting in his official capacity amount to claims against the Town of Peru. *See Stuart v. City of Gloucester,* Civil Action No. 18-cv-11877-ADB, 2019 WL 3082830, at *13 (D. Mass. July 15, 2019).

No. 50 at 8).  Nutting asserts that there was no state action involved as he was off-duty and not

acting in his official capacity as a police officer when he discussed Sherilyn with Marley after

Hamilton requested a well-being check (Dkt. No. 40 at 4-6; Dkt. No. 42 at 3).  The court agrees.

To plead a § 1983 violation, a plaintiff must allege facts showing that "the conduct

complained of was committed by a person acting under color of state law." *Parratt v. Taylor,*

451 U.S. 527, 535 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S.

327 (1986).  *See Hafer v. Melo,* 502 U.S. 21, 27 (1991) ("Through § 1983, Congress sought 'to

give a remedy to parties deprived of constitutional rights, privileges and immunities by an

official's abuse of his position.'") (quoting *Monroe v. Pape,* 365 U.S. 167, 172 (1961), *overruled*

*on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  A government

employee, such as a police officer, generally "acts under color of state law while acting in his

official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins,*

487 U.S. 42, 50 (1988).  *See Martinez,* 54 F.3d at 986 ("In general, section 1983 is not implicated

unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his

office, or unless the conduct is such that the actor could not have behaved in that way but for the

authority of his office.").

"The determination of whether a police officer was acting under color of state law

requires a court to assess the totality of the circumstances and consider '"the nature and

circumstances of the officer's conduct and the relationship of that conduct to the performance of

his official duties."'" *Gueits-Colón*, 177 F. Supp. 2d at 135 (quoting *Zambrana–Marrero v.*

*Suarez-Cruz,* 172 F.3d 122, 125 (1st Cir. 1999)).  Relevant factors include

> the officer's garb; his duty status and the existence of a regulation providing that
> officers are on duty twenty-four hours a day; the use of a squad car and police
> radio; the use of a service arm or weapon; the use of handcuffs or other traditional

law-enforcement tools; whether the officer detained, interrogated, or searched a
citizen; and the location of the incident.

*Id.* at 135 (citing cases).  No single factor will be dispositive in determining whether an officer

was acting under color of state law.  *See id.* (citing *Zambrana-Marrero,* 172 F.3d at 125;

*Barreto-Rivera v. Medina-Vargas,* 168 F.3d 42, 45 (1st Cir. 1999)).

The law recognizes that police officers have private lives.  "[N]ot every action

undertaken by a person who happens to be a police officer is attributable to the state."  *Martinez*,

54 F.3d at 986.  "Though 'under "color" of law means under "pretense" of law,' even so, the acts

of state officials 'in the ambit of their personal pursuits' are not state action."  *Id.* (quoting *Screws*

*v. United States,* 325 U.S. 91, 111 (1945)).  *See Gibson v. City of Chicago,* 910 F. 2d 1510, 1516

(7th Cir. 1990) (a defendant's "mere status as a policeman does not render all his acts under color

of state law."); *Stengel v. Belcher,* 522 F.2d 438, 441 (6th Cir. 1975) ("Acts of police officers in

the ambit of their personal, private pursuits fall outside of 42 U.S.C. § 1983.").  "Accordingly, a

policeman's private conduct, outside the line of duty and unaided by any indicia of actual or

ostensible state authority, is not conduct occurring under color of state law."  *Martinez,* 54 F.3d

at 986-87 (citing cases).

Plaintiff's allegations do not support her assertion that Nutting, who was a Peru police

officer living in Dalton, was acting in his capacity as a law enforcement officer on November 23,

2019 when he spoke to Marley about Sherilyn (Dkt. No. ¶¶ 5, 8, 11, 14).  Plaintiff alleges that,

earlier that day, Nutting and Sherilyn were together in their apartment in Dalton when they

argued about Nutting's alleged infidelity (Dkt. No. 1 ¶¶ 12, 20).  Nutting left the apartment and

was having dinner with Peru's police chief at 6:24 P.M. when Marley called the chief's personal

cell phone in an effort to find Nutting (Dkt. No. 1 ¶¶ 40, 41).  During Nutting's conversation with

Marley, Nutting allegedly told Marley that Sherilyn was "upset" and had mentioned wanting to

harm herself, but he did not believe that she would follow through with her threat, and there was

no reason for the Dalton police to conduct a well-being check (Dkt. No. 1 ¶¶ 42, 46).

Plaintiff fails to allege sufficient facts to support the claim that Nutting was "acting in his

official capacity or exercising his responsibilities pursuant to state law" when he spoke to

Marley. *West,* 487 U.S. at 50. Nutting was off-duty and there are no allegations that Nutting

was in uniform, was using police equipment, or was in a police facility when he spoke to Marley

about Sherilyn. *See Gueits-Colón,* 177 F. Supp. 2d at 135. "The important consideration . . . in

determining whether an officer is acting under color of state law is the nature of the specific acts

performed." *Latuszkin v. City of Chicago,* 250 F.3d 502, 505-06 (7th Cir. 2001).

The complaint includes no facts from which it can be reasonably inferred that Nutting's

opinion about Sherlyn's threat of suicide was offered in his capacity as a police officer. *See

Martinez,* 54 F.3d at 987 ("Even though 'acting under color of law' includes 'acting under

pretense of law' for purposes of a state action analysis, there can be no pretense if the challenged

conduct is not related in some meaningful way either to the officer's governmental status or to

the performance of his duties."). Rather, Nutting was acting "in a private capacity" speaking

about a personal relationship when he spoke with Marley about Sherilyn's status. *Zambrana-

Marrero,* 172 F.3d at 126. *See Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir.

1982) (off-duty police officer who shot his wife with his service revolver was not acting under

color of state law since his actions were not "'committed in the performance of any actual or

pretended duty,'" but were performed "'in the ambit of (his) personal pursuits'") (citations

omitted). Plaintiff fails to allege facts or point to legal authority to support her assertion that

Nutting "was engaged in a form of official duty" because he was having dinner with his

supervisor (Dkt. No. 50 at 8). In addition, Marley's awareness that Nutting was a Peru police

officer does not convert Nutting into a state actor. *See Van Ort v. Estate of Stanewich,* 92 F.3d 831, 839 (9th Cir. 1996) (even if defendant's robbery victims recognized him as a law enforcement officer, that recognition, alone, did not "transform private acts into acts under color of state law.").

Plaintiff cites a portion of *Zambrana-Marrero* to support her contention that "'[t]he subjective perception of' . . . Marley is critical in determining how he viewed . . . Nutting's analysis of the ongoing situation and whether a well-being check was required" (Dkt. No. 50 at 7, 8 (quoting *Zambrana-Marrero*, 172 F.3d at 126)). However, *Zambrana-Marrero* actually says: "[a]lthough the subjective reactions of the victim may have some relevance, 'the primary focus of the color of law analysis must be on the conduct of the police officer,' *Barreto-Rivera,* 168 F.3d at 47, and whether it 'related in some meaningful way either to the officer's governmental status or to the performance of his duties.'" *Zambrano-Marrero,* 172 F.3d at 126 (quoting *Martinez,* 54 F.3d at 987). So far as appears from the complaint, Nutting's conversation with Marley was wholly unrelated to any duty Nutting had as a police officer (for Peru, not Dalton) and Marley's perception of whether Nutting was acting as a police officer is not controlling.

Relying on findings in the arbitrator's findings of fact and conclusions of law, Plaintiff further contends that Nutting was acting to preserve his employment status as a police officer when he told Marley that a well-being check at Sherilyn's apartment was not necessary (Dkt. No. 1-1 at 25; Dkt. No. 50 at 9). For two reasons, this contention does not assist Plaintiff. First, the arbitrator's factual findings are not properly before this court. *See Henneberger,* 465 F. Supp. 2d at 185. Second, even if the court were to take this information into account, and it cannot, Plaintiff points to no authority for her contention that Nutting's purported motive, which,

assuming it to be true, would be personal rather than professional, could transform him into a state actor exercising the authority of a law enforcement officer.

Because the complaint offers no basis for concluding that Nutting was acting as a police officer when he spoke with Marley, Plaintiff has not alleged a viable § 1983 claim against Nutting.  For this reason, the Town of Peru's and Nutting's motions to dismiss are allowed with respect to Counts I, II, III, and IX.  *See Wilson v. Town of Mendon,* 294 F.3d 1, 6-7 (1st Cir. 2002) ("If . . . the officer has inflicted no constitutional harm, . . . the municipality . . . can[not] be held liable.") (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam)).[15]

        2.     State Law Claims against Nutting in his Individual Capacity
                    (Counts VI & VIII).

Counts VI and VIII allege state law claims of gross negligence and wrongful death against Nutting (and other Defendants).  The elements of each of these claims, set forth above, require proof of negligence.  "'Suicide is generally considered an intervening act which breaks the causal connection between [a] negligent act and [a] death.'"  *N. Shore Pharmacy Servs. v. Breslin Assoc. Consulting LLC,* Civil Action No. 02-11760-NG, 2004 WL 6001505, at *4 (D. Mass. June 22, 2004) (citation omitted).  *See Williams v. Kawasaki Motors Corp., U.S.A.*, Civil Action No. 16-30142-MGM, 2018 WL 6619746, at *4 (D. Mass. Dec. 18, 2018) ("Under Massachusetts law, 'suicide may be viewed as an independent intervening cause between a defendant's conduct and the decedent's death.'") (citation omitted).  There are, however, exceptions to this general rule when "(1) the defendant's negligence was the cause of the

---

[15] Count IV alleges a "Conspiracy by State Actor" to deprive Sherilyn of the equal protection of the laws in violation of 42 U.S.C. § 1985(2) and (3) (Dkt. No. 1 at 14-15).  As previously discussed, Nutting was not a state actor with regard to the events at issue and the parties do not address Nutting's personal liability for conspiracy under 42 U.S.C. § 1985 (Dkt. Nos. 42, 48).  Consequently, Counts IV and V are also dismissed as to Nutting.

decedent's uncontrollable suicidal impulse; or (2) the decedent was in the defendant's custody and the defendant had knowledge of the decedent's suicidal ideation." *Nelson v. Mass. Port Auth.*, 771 N.E.2d 209, 211–12 (Mass. App. Ct. 2002) (citations omitted). Another session of this court has identified a third exception if "'the plaintiff can demonstrate that the defendant's intentional conduct caused severe emotional distress that was a substantial factor in bringing about the suicide.'" *N. Shore Pharmacy Servs.,* 2004 WL 6001505, at *4 (quoting *Collins v. Village of Woodridge,* 96 F. Supp. 2d 744, 756 (N.D. Ill. 2000)). On their face, one or more of these exceptions might apply to Nutting. In the absence of any developed argument by Nutting as to why this is not so, the court will not dismiss these claims at this early stage.

V.    CONCLUSION

For the aforementioned reasons, Marley's motion to dismiss (Dkt. No. 20) is ALLOWED with respect to Counts I, III, IV, V, VI, VIII, and IX, as against Marley in his individual capacity and DENIED with respect to Count II as against Marley in his individual capacity; the Town of Peru's and Nutting's motion to dismiss in his official capacity (Dkt. No. 39) is ALLOWED with respect to all claims; and Nutting's motion to dismiss in his individual capacity (Dkt. No. 41) is ALLOWED with respect to the federal claims, Counts I, II, III, IV, V, and IX, and DENIED with respect to the state law claims, Counts VI and VIII. No separate and final judgment will enter.

The clerk is directed to schedule a Fed. R. Civ. P. 16(a) and (b) conference to be attended by all remaining parties to this suit.

It is so ordered.

February 17, 2022                                    /s/ Katherine A. Robertson
                                                     KATHERINE A. ROBERTSON
                                                     U.S. MAGISTRATE JUDGE