cUNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PATRICIA HAYES, as Executor of )
the Estate of Sherilyn Hayes, )
                                     )
       Plaintiff, )
                                       )
      v. )
                                         )
TOWN OF DALTON, JOHN MARLEY, )  Case No. 3:21-cv-30055-KAR
Dalton Police Officer, in his individual )
and official capacities, and FRANK M. SPETH, )
III, Dalton Dispatcher, in his individual )
and official capacities, )
                                         )
      Defendants. )

## MEMORANDUM AND ORDER REGARDING DEFENDANT MARLEY'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION TO STRIKE, AND MARLEY'S MOTION TO STRIKE
(Dkt. Nos. 130, 144 & 147)

ROBERTSON, U.S.M.J.

     In the aftermath of her daughter Sherilyn Hayes's ("Sherilyn")[1] suicide, Plaintiff Patricia Hayes ("Plaintiff") filed suit seeking damages from Dalton police officer John Marley ("Marley"), Dalton police dispatcher, Frank M. Speth, III ("Speth"), and the Town of Dalton ("Dalton" or "the Town") (collectively, "Defendants"). Plaintiff alleges that Defendants were notified that Sherilyn intended to kill herself and their failure to intervene to try to prevent her death violated Sherilyn's constitutional right to the equal protection of the laws and made them liable under state law. Now pending before the court is Marley's motion for summary judgment (Dkt. No. 130) as well as Plaintiff's and Marley's motions to strike material from the summary judgment record (Dkt. Nos. 144 & 148). The parties have consented to this court's jurisdiction

---

[1]The court uses Sherilyn's first name to avoid confusion. No disrespect is intended.

(Dkt. No. 45). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court DENIES Marley's motion for summary judgment in part and GRANTS it in part, GRANTS Plaintiff's motion to strike, and DENIES Marley's motion to strike in part and GRANTS it in part.

I.     Factual Background[2]

Plaintiff's claims are based on Marley's failure to respond to a call for protective services at the residence of Sherilyn and her fiancé, Kyle Nutting, in Dalton on November 23, 2019 (DSOF ¶¶ 4, 5; Pl. Resp. DSOF ¶¶ 4, 5). At that time, Marley was a veteran Dalton police officer and Dylan Bencivenga had served as a Dalton officer for approximately one year (DSOF ¶¶ 1, 3; Pl. Resp. DSOF ¶¶ 1, 3; Dkt. No. 132-24 ¶ 1). Speth was the civilian dispatcher for the Dalton Police Department ("DPD") (Dkt. No. 132-2 at 8-9).

At 6:16 P.M., Speth answered Tyler Hamilton's call to the DPD's non-emergency line (DSOF ¶ 5; Pl. Resp. DSOF ¶ 5). Hamilton stated that his friend, Nutting, reported that his fiancé, Sherilyn, had threatened to kill herself during an argument in their apartment (DSOF ¶ 6; Pl. Resp. DSOF ¶ 6). Hamilton further indicated that Nutting was a police officer in the town of Peru, that there were weapons in the house, and that Nutting had left the residence (DSOF ¶ 6; Pl. Resp. DSOF ¶ 6). Hamilton did not mention violence or threats of violence between Nutting and Sherilyn (DSOF ¶ 8; Pl. Resp. DSOF ¶ 8). Speth told Hamilton that he would send officers to the apartment (DSOF ¶ 7; Pl. Resp. DSOF ¶ 7).

---

[2] Unless otherwise indicated, the facts are drawn from Defendant Marley's Statement of Material Facts in Support of His Motion for Summary Judgment ("DSOF") (Dkt. No. 132); and Plaintiff's Responses to Defendant Marley's Statement of Material Facts in Support of His Motion for Summary Judgment ("Pl. Resp. DSOF") (Dkt. No. 143) Citation to page numbers are to the numbers assigned by the court's ECF system.

Speth radioed on-duty officers Marley and Bencivenga, notifying them that Hamilton just reported that his friend was involved in a "domestic" (DSOF ¶ 9; Pl. Resp. DSOF ¶ 9).  Speth asked that an officer call him for additional information (DSOF ¶ 9; Pl. Resp. DSOF ¶ 9). Generally, dispatchers did not make such requests (DSOF ¶ 14; Pl. Resp. DSOF ¶ 14).

Because Marley was at the police station, he spoke to Speth in person (DSOF ¶ 11; Pl. Resp. DSOF ¶ 11).  Speth told Marley that Hamilton had requested a well-being check after he received messages from Nutting, a Peru police officer, indicating that Sherilyn had made statements about killing herself during an argument (DSOF ¶ 12; Pl. Resp. DSOF ¶ 12; Dkt. No. 143-2 at 6; Dkt. No. 143-6 at 3).  Speth also reported that Nutting was having dinner with the Peru police chief, there were weapons at Sherilyn's and Nutting's apartment, and Hamilton wanted officers to call him (DSOF ¶ 12; Pl. Resp. DSOF ¶ 12).  Marley told Speth that he would make some telephone calls (DSOF ¶ 18; Pl. Resp. DSOF ¶ 18).

At 6:21 PM, Marley radioed Bencivenga and ordered him to "stand by" (DSOF ¶ 21; Pl. Resp. DSOF ¶ 21; Dkt. No. 132-3 at 4).

Trying to reach Nutting, Marley called Peru Police Chief Jeffrey Henault whose phone number was in Marley's personal phone (DSOF ¶ 26; Pl. Resp. DSOF ¶ 26).  Henault handed his cell phone to Nutting who told Marley that, during the argument, Sherilyn said she "felt like she wanted to die" and threatened to commit suicide (DSOF ¶ 29; Pl. Resp. DSOF ¶ 29; Dkt. No. 143-4 at 6).  After the call concluded, Nutting believed Marley would conduct a well-being check on Sherilyn (Dkt. No. 143-4 at 2).

At 6:29 PM, after Marley finished speaking to Nutting, he called Hamilton (DSOF ¶ 44; Pl. Resp. DSOF ¶ 44).  The conversation was recorded so its contents are undisputed (Dkt. No. 132-15; Dkt. No. 142 at 159-60).  Marley told Hamilton that Nutting was a little concerned about

his fiancé and that she made some statements and asked Hamilton's opinion as to whether the

police needed to go to the apartment and talk to her and make an evaluation.  Hamilton

responded that Nutting had told him that Hamilton checking on her would give him some peace

of mind that she "wasn't going to do anything."  Hamilton reported that he and his fiancé had

knocked on the door for some twenty minutes without getting a response.  He also said that

Sherilyn did not have a car and could not have gone anywhere.  In response to Hamilton's

expression of concern that the situation might interfere with Nutting's career as a police officer,

Marley replied:

> I hear what you're saying, but he's not calling and asking us to do this.  So you're
> the caller.  So for us to go there and either force our way into that home or to take
> her into custody, we need someone to tell us that that's what they're asking us to
> do.  We can't just . . . go with, well, we don't want you to go, but I wanted to tell
> you.  It . . . just doesn't work that way with us.  We need you to say you are
> saying you want us to go there and check on her or you're going to use some
> other means yourself to do that or we're going to go there and she doesn't answer
> the door.  We're either going to break the door down or we're going to get a . . .
> key and go in and talk to her.

By the end of the call, Hamilton had indicated to Marley that he would try to speak to Sherilyn.

Marley asked Hamilton to let the police know what occurred at the residence (DSOF ¶ 45; Pl.

Resp. DSOF ¶ 45; Dkt. No. 132-15; Dkt. No. 142 at 159-60).

      At approximately 6:40 PM, Hamilton called dispatch and told Speth and Marley that

Nutting was returning to the apartment to check on Sherilyn (DSOF ¶ 47; Pl. Resp. DSOF ¶ 47).

Hamilton's call for a well-being check was cleared at 6:50 PM without any DPD officers

responding to Sherilyn and Nutting's apartment (Dkt. No. 132-2 at 28-29; Dkt. No. 132-4).

Approximately ten minutes later, Nutting discovered that Sherilyn had committed suicide in the

apartment (DSOF ¶ 52; Pl. Resp. DSOF ¶ 52).  Marley and Bencivenga responded to the 911 call

for assistance (DSOF ¶ 53; Pl. Resp. DSOF ¶ 53; Dkt. No. 143-6 at 4).  Sherilyn was transported to Berkshire Medical Center at 7:30 PM (DSOF ¶ 54; Pl. Resp. DSOF ¶ 54).

The DPD's guidelines concerning responses to calls for services provides, in part, that "[t]he manner in which officers respond to calls . . . must vary according to the nature and severity of the call [as] necessary to ensure the maximum safety of the general public and the officers themselves" and acknowledge the possibility of circumstances that may justify altering normal procedures (Dkt. No. 142 at 93).

Plaintiff alleges that Marley denied Sherilyn her constitutional right to equal protection, and was negligent and reckless in his handling of Hamilton's call for protective services (Compl. ¶¶ 89-94, 106-107).

II.    Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome."  *Id.* (citing *Borges*, 605 F.3d at 5).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).  "A non-moving party may 'defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.'"  *Salem v.*

*Stoneham Police Dep't*, Civil Action No. 22-CV-10350-AK, 2024 WL 4335454, at *4 (D. Mass. Sept. 27, 2024) (quoting *Paul v. Murphy,* 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted)).

III.    Discussion

"[T]he [c]ourt will first address [the parties'] motions to strike, as the 'rulings [on those motions will] define the record on which summary judgment rests.'" *Foregger v. Residential Credit Sols., Inc.*, Civil Action No. 12-11914-FDS, 2014 WL 1364788, at *3 (D. Mass. Apr. 4, 2014) (third alteration in original) (quoting *Livick v. The Gillette Co.*, 524 F.3d 24, 28 (1st Cir. 2008)).

A.    Plaintiff's Motion to Strike Marley's Requests for Admissions

Plaintiff has moved to strike the Town's responses to Marley's requests for admissions on the ground that Marley served the requests some seven months after the deadline for completion of non-expert discovery (Dkt. No. 144).  In opposition, Marley argues that the late service of the requests served the interests of the parties and of judicial economy (Dkt. No. 149).

"Federal Rule of Civil Procedure 36 permits a party to 'serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact or opinions about either; and (B) the genuineness of any described documents.'" *Figueira v. MWV Mobile Veterinary Clinic, PLLC*, Civil No. 14-cv-304-SM, 2015 WL 10963744, at *1 (D.N.H. Sept. 9, 2015) (alteration in original) (quoting Fed. R. Civ. P. 36(a)(1)).  Requests for admissions generally are treated as discovery that are subject to discovery deadlines.  *See Valentin v. Town of Natick,* Civ. Action No. 1:21-CV-10830-PBS, 2023 WL 2170181, at *2 (D. Mass. Jan. 20, 2023) (citing *Figueira,* 2015 WL 10963744, at *2).

There is no doubt that the requests for admission were not timely served.  There is also no doubt that, if the court relied on them, Plaintiff would be prejudiced.  After a series of requests

for extensions of time were granted, on September 19, 2023, the court established October 30, 2023 as the final deadline for completion of non-expert discovery including requests for admissions (Dkt. Nos. 69, 85, 86, 87, 100, 114). On February 12, 2024, due to difficulty scheduling a deposition, the court granted the parties' joint motion to extend the deadlines for filing dispositive motions to June 3, 2024 (Dkt. Nos. 119, 120). Speth was deposed on February 13, 2024 (Dkt. No. 143-2 at 1). According to Marley, Speth's deposition was suspended before Marley's counsel had an opportunity to question Speth about the Town's dispatch call logs (Dkt. No. 149-1 at 1-3). Without consulting Plaintiff, at least so far as appears from the record, counsel for defendants Marley, Speth, and the Town agreed that the Town's current police chief, who had been deposed as the Town's Rule 30(b)(6) deponent, would respond to requests for admissions addressing Marley's responses to nine calls for well-being checks that were recorded in the DPD call logs (Dkt. No. 132-17). Without seeking an enlargement of time from the court, Marley's requests for admissions were served on the parties, including Plaintiff, on April 12, 2024 (Dkt. No. 149-2). The Town's responses were served on May 29, 2024 (Dkt. No. 132-17 at 5). Marley's motion for summary judgment was filed five days later, on June 3, 2024 (Dkt. No. 130).

Plaintiff did not consent to Defendants' proposal to use the requests for admissions as a substitute for further deposition testimony from Speth. She did not have an opportunity to question the Town's Rule 30(b)(6) deponent about responses to the requests for admissions, which appear be in some tension with deposition testimony the deponent gave that was material and favorable to Plaintiff. In addition, Marley did not seek an extension of time to serve the requests approximately six months after the deadline for the completion of fact discovery. *See Kershner v. Beloit Corp.*, 106 F.R.D. 498, 499 (D. Me. 1985) ("The proper course for

[defendant] to have followed when [he] sought to utilize [requests for admissions] after the . . . discovery cut-off date, was to file a motion seeking an enlargement of the deadline for that specific purpose.").  The responses to the requests for admissions were served some seven months after the discovery deadline and five days before Marley filed his summary judgment motion relying, in part, on the responses to his untimely-served requests for admission.  In these circumstances, Plaintiff's motion to strike is granted.  *See Lohnes v. Level 3 Commc'ns,* 272 F.3d 49, 60 (1st Cir. 2001) ("This is exactly the type of unfair tactical advantage that the [discovery] rules were designed to eradicate."); *Figueira*, 2015 WL 10963744, at *1-2 (granting motion to strike requests for admissions that were served more than three months after the deadline for completion of discovery).

B.    Marley's Motion to Strike

Marley has moved to strike (1) the DPD's March 10, 2020 Investigative Report of special investigator Alfred P. Donovan ("Donovan Report") as well as the report's seventeen exhibits (Dkt. No. 142 at 100-287; Dkt. No. 143-5), (2) the opinion and award of arbitrator Betty E. Waxman (Dkt. No. 142 at 31-60), (3) references to the report of Joseph A. Felo, D.O., concerning the time of Sherilyn's death ("Dr. Felo's Report") (Dkt. No. 132-22), and (4) Plaintiff's references to "common knowledge" of a lock box containing a key to Sherilyn's apartment (Dkt. No. 142 at 20, 24; Dkt. No. 143 at 21-22, ¶¶ 50-51).  Plaintiff opposes the motion (Dkt. No. 154).

1.    The Donovan Report

Marley seeks to exclude the Donovan Report and its seventeen exhibits as hearsay. Plaintiff counters that the report is admissible as the statement of a party opponent, a business record, or the statement of a public office.

The Dalton Select Board hired Donovan, a special investigator, to examine Marley's response to the November 23, 2019 call for a well-being check of Sherilyn (Dkt. No. 143-5 at 1, 4, 40). Donovan concluded that Marley's failure to respond violated the department's rules, regulations, and policies (Dkt. No. 143-5 at 9-10, 36). With the exception of Marley's statements to Donovan, which are admissible as non-hearsay as to Marley, and Speth's statements to Donovan, which are admissible as non-hearsay as to Speth, the Donovan Report is inadmissible hearsay under Fed. R. Evid. 801(d)(2), 803(6), and 803(8) when offered against Marley or Speth.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Harmon v. Boston Med. Ctr.*, Civil Action No. 22-11856-MJJ, 2024 WL 4815292, at *4 (D. Mass. Nov. 18, 2024), *appeal docketed,* No. 24-2073 (1st Cir. Nov. 25, 2024) (quoting *Vazquez v. Lopez-Rosario,* 134 F.3d 28, 33 (1st Cir. 1998) (citing Fed. R. Evid. 801(c)). "Generally, evidence that constitutes hearsay is not admissible at trial or for summary judgment purposes, unless it falls within one of the exceptions specified in the Federal Rules of Evidence." *Rojas-Ramirez v. BMJ Foods, Inc.*, Civil No. 09-1593 (GAG), 2011 WL 693621, at *3 (D.P.R. Feb. 24, 2011) (citing *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 425 F.3d 67, 76 (1st Cir. 2005) (internal citations omitted)).

A statement is not hearsay and is admissible against a party opponent if it "was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). "There are only two requirements for admissibility under [Fed. R. Evid.] 801(d)(2)(A): a statement was made by a party, and the statement was offered against that party." *Jordan v. Binns*, 712 F.3d 1123, 1128–29 (7th Cir. 2013) (citing *United States v. Matlock,* 415 U.S. 164, 172 & n.8 (1974);

*United States v. Penaloza,* 648 F.3d 539, 547 (7th Cir. 2011)).  Because the Donovan Report is

not Marley or Speth's statement, it is not admissible against them under Fed. R. Evid.

801(d)(2)(A).  However, to the extent there are statements by Marley or Speth included in

Donovan's report, those statements are non-hearsay statements of a party opponent and are

admissible against Marley or Speth if offered by Plaintiff.  *See* Fed. R. Evid. 801(d)(2)(A).

The Donovan Report is not admissible as a business record of the Town as defined by

Fed. R. Evid. 803(6).  Plaintiff has failed to present the testimony of a records custodian showing

that Donovan's investigation was a "regularly conducted activity" of the Town and that making

such a report was the Town's "regular practice."  Fed. R. Evid. 803(6)(B), (C), (D).  *Compare*

*United States v. Carmona-Bernacet,* 663 F. Supp. 3d 164, 174-75 (D.P.R. 2023) (telephone

service provider's records were admissible under the business records exception because the

records custodian certified that the records complied with all of Rule 803(6)'s requirements).

Nor is the report admissible as a public record.  "Federal Rule of Evidence 803(8) exempts from

the general prohibition against hearsay certain records or statements of a public office," *United*

*States v. Zarauskas*, 814 F.3d 509, 519 (1st Cir. 2016), if they set out: ". . . factual findings from

a legally authorized investigation; and . . . the opponent does not show that the source of

information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).

*See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988).  "The exception rests on 'the

assumption that a public official will perform his duty properly,' without bias or improper

motivation."  *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135, 141 (D. Mass. 1990) (quoting

*Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613, 618 (8th Cir. 1983) (quoting advisory

committee's note to proposed Fed. R. Evid. 803(8)).  As the proponent of the evidence, Plaintiff

has the burden to show that the document was prepared by a "public office."  Fed. R. Evid.

803(8).  *See United States v. Davis,* 826 F. Supp. 617, 621 (D.R.I. 1993).  Plaintiff has not done

so.  Donovan is not a public office.  There is no evidence that the Town participated in the

investigation of the November 23, 2019 incident or in preparing the Donovan Report as is

required for the report to be considered a public record under the rule.  *Compare id.* at 619, 621-

22 (an outside investigator's report concerning a hazardous waste site was admissible as a public

record because the EPA, a public agency, was sufficiently involved in overseeing the

investigation and drafting the report).  Consequently, the Donovan Report is not admissible

under Fed. R. Evid. 803(8).

To summarize, with the exception of Marley's and Speth's statements to the extent those

statements are offered against them, which are admissible under Fed. R. Evid. 801(d)(2)(A), the

Donovan Report is inadmissible hearsay and is stricken.

2.    The Arbitrator's Opinion and Award

The arbitrator found that Marley's primary motivation for not responding to Sherilyn's

residence was to protect Nutting, a fellow police officer, and that the Town did not violate the

collective bargaining agreement by placing Marley on administrative leave and terminating his

employment (Dkt. No. 142 at 56-58, 60).  Defendant maintains that the arbitrator's opinion is

inadmissible hearsay and, even if it is admissible, its probative value is outweighed by the danger

of unfair prejudice (Dkt. No. 157).

While there is some authority for treating an arbitrator's decision as hearsay, *see Kirouac

v. Donahoe,* No. 2:11-CV-00423-NT, 2013 WL 5952055, at *8 (D. Me. Nov. 6, 2013), the

court's decision to exclude the arbitrator's decision rests on other grounds.  "A trial court has the

discretion to admit an arbitration decision into evidence and to accord it such weight as is

deemed appropriate, but there is no requirement that the court must allow an arbitration decision

to be admitted at all." *Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994) (citing *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60 (1974)); *see also Kirouac,* 2013 WL 5952055, at *1 ("[T]he decision to admit or exclude an arbitration award lies within the [c]ourt's discretion.").  The arbitrator's decision addresses questions that are at the core of this case and there is a risk that a jury would afford the arbitrator's decision undue weight.  That risk "substantially outweigh[s]" the opinion's probative value.  Fed. R. Evid. 403.  *See Moore v. Sequeira,* No. 3:21-cv-00787 (VAB), 2024 WL 1013301, at *5 (D. Conn. Mar. 8, 2024) (excluding an arbitration decision under Rule 403 because "the 'allure of a prior expert adjudication [may] be strong for a jury'") (alteration in original) (citation omitted)); *Lobster 207, LLC v. Pettegrow,* No. 1:19-CV-00552-LEW, 2023 WL 4882808, at *2 n.1 (D. Me. Aug. 1, 2023) ("[T]he admission of the arbitration award would be unfairly prejudicial pursuant to Rule 403 in order to ensure that the jury does not abandon its fact-finding role.").

       3.    Dr. Felo's Report

Relying on Fed. R. Evid. 702, Defendants argue that Plaintiff's references to Dr. Felo's report, which includes his opinion as to Sherilyn's time of death, should be stricken from the summary judgment record (Dkt. No. 148 at 8-9).

Federal Rule of Evidence 702 ("Rule 702") "incorporates the reasoning of the Supreme Court . . . in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), [and] 'affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.'" *Rodríguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendment)).  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Under *Daubert* and Rule 702, the burden on the party who proffers expert testimony is not to prove that an expert's conclusion is correct but rather that the expert reached their conclusion in a scientifically sound and methodologically reliable way." *Liberty Mut. Ins. Co. v. Broan-NuTone LLC*, 731 F. Supp. 3d 205, 212 (D. Mass. 2024) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

There are additional considerations that apply to the evaluation of expert opinion evidence at the summary judgment stage.

> The court can apply *Daubert* at summary judgment, but "[b]ecause the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at [that] stage." *Cortés-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). The problem is that courts typically have only a "truncated record" at summary judgment, whereas *Daubert* requires a "complex factual inquiry." *Id.* Thus, "where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious . . . not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Id.* Nonetheless, "[t]he [court's] obligation to perform this [*Daubert*] gatekeeping role necessarily applies at the summary judgment stage of litigation given the objective to avoid prolonging a case that lacks merit." *Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 58 (1st Cir. 2024).

*Liberty Mut. Ins. Co.*, 731 F. Supp. 3d at 212–13 (alterations in original). "[E]xclusion of an expert report at summary judgment is only warranted when the report's 'defects are obvious on the face of [the] proffer.'" *SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC,* 722 F. Supp. 3d 16, 47 (D. Mass. 2024) (alteration in original) (quoting *Cortés-Irizary,* 111 F.3d

at 188).  Dr. Felo's report is not obviously defective on its face.  *See Doucette v. Jacobs,* 106

F.4th 156, 169 (1st Cir. 2024).  In the court's view, a *Daubert* hearing will be required to

determine whether Dr. Felo's opinion testimony will be admissible at trial.  For this reason, so

much of Marley's motion to strike as is directed at Dr. Felo's report is denied without prejudice.

> 4. Common knowledge of a lock box at Sherilyn's apartment
> complex containing a master key to all apartments

The court grants Defendants' motion to strike Plaintiff's references to the DPD's

"common knowledge" of a lock box containing a key to Sherilyn's building or apartment (Dkt.

No. 148 at 6-7).  Plaintiff has not suggested a basis for the admissibility of this hearsay evidence

which, in any event, is of marginal, if any, relevance in the case (Dkt. No. 154).  *See Leavitt v.*

*Corr. Med. Servs., Inc.*, Civ. No. 8-132-B-W, 2009 WL 103549, at *3 (D. Me. Jan. 13, 2009),

*rec. dec. adopted,* Civil No. 08-132-B-W, 2009 WL 465813 (D. Me. Feb. 24, 2009) ("At the

very least, [plaintiff] would need to divulge the underlying factual basis for his conclusory

statement about what is common knowledge, which is something he has not offered."); Fed. R.

Evid. 401.

> C. Federal Claim:  Denial of Equal Protection (Count II)

At the motion to dismiss stage, the court held that Plaintiff's complaint adequately stated

a claim in Count II that Marley violated her rights under the Equal Protection Clause by treating

her differently than other similarly situated individuals because he delayed and ultimately did not

respond to Hamilton's request for police assistance for Sherilyn so as to protect the interests of

Nutting, a fellow law enforcement officer.  *Hayes v. Town of Dalton*, Case No. 3:21-cv-30055-

KAR, 2022 WL 488466, at *7-9 (D. Mass. Feb. 17, 2022).  Marley did not raise a qualified

immunity defense to Plaintiff's Equal Protection claim at the motion to dismiss stage, *id.* at *7

n.10, and the court observed that addressing the claim would require the parties to engage in

discovery.  *Id.* at *8 n.12.  *See Pimental v. City of Methuen*, 323 F. Supp. 3d 255, 271 (D. Mass. 2018) (observing that the complaint's allegations raised a question that could only be answered after discovery and development of the factual record).  At this stage, after discovery and based on a more developed factual record, Marley argues that the evidence adduced in discovery shows that he did not violate Plaintiff's right to equal protection, and, in any event, he is entitled to qualified immunity at the summary judgment stage.  "Because qualified immunity is an immunity from suit, an officer's claim of qualified immunity 'ought to be resolved as soon as possible in [the] litigation.'"  *Brown v. Dickey*, 117 F.4th 1, 6 (1st Cir. 2024) (alteration in original) (quoting *Norton v. Rodrigues*, 955 F.3d 176, 183 (1st Cir. 2020)).  Accordingly, the court turns to that question.

1.     Qualified Immunity

"Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity "protects all but 'the plainly incompetent [and] those who knowingly violate the law.'"  *Pagán v. Calderón*, 448 F.3d 16, 31 (1st Cir. 2006) (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable.  *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) (quoting *Rivera-Corraliza v. Puig-*

*Morales*, 794 F.3d 208, 215 (1st Cir. 2015)).

The qualified immunity analysis breaks down into two parts.  *McKenney*, 873 F.3d at 81.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal

statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly

established at the time.'"  *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)

(quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "The 'clearly established' inquiry itself

has two elements."  *Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir.), *cert. denied*, 141 S. Ct. 896

(2020).  The first focuses on the clarity of the law.  *Id.*  While "a case directly on point" is

unnecessary, "existing precedent must have placed the statutory or constitutional question

beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*,

483 U.S. 635, 640 (1987); *Malley*, 475 U.S. at 341).  The rule must be settled, meaning that it is

"dictated by 'controlling authority' or 'a robust consensus of cases of persuasive

authority.'"  *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741–42).  "The precedent must

be clear enough that every reasonable official would interpret it to establish the particular rule

the plaintiff seeks to apply."  *Id.* (citing *Reichle*, 566 U.S. at 666).  "Although cases involving

similar facts can be helpful, they are not necessary to a determination that the law is clearly

established, particularly where the officer's conduct is egregious or otherwise obviously

unconstitutional."  *Johnson v. City of Biddeford*, 665 F. Supp. 3d 82, 110 (D. Me. 2023) (citing

*Irish v. Fowler*, 979 F.3d 65, 76, 78 (1st Cir. 2020); *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st

Cir. 2011)).

The second element of the "clearly established" inquiry "'focuses on the objective legal

reasonableness of an official's acts . . . .'"  *Castagna*, 955 F.3d at 220 (quoting *Eves v. LePage*,

927 F.3d 575, 583 (1st Cir. 2019) (en banc)).  This requires a focus "'on the facts of the

particular case and whether a reasonable defendant would have understood that his conduct

violated the plaintiff's constitutional rights.'" *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir.

2019) (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (2013)).  "'Evidence concerning the

defendant's subjective intent is simply irrelevant' to the second step of the inquiry." *Eves*, 927

F.3d at 583 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)).  "As such, if an

objectively reasonable official in [Marley's] shoes 'might not have known for certain that [his]

conduct was unlawful, then [Marley] 'is immune from liability.'" *Id.* (quoting *Ziglar v. Abbasi*,

582 U.S. 120, 152 (2017)).   The components of the qualified immunity test can be addressed in

any order.  *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (citing *Pearson*, 555 U.S. at

236); *see also, e.g., Punsky v. City of Portland*, 54 F.4th 62, 66 (1st Cir. 2022) (same).

The First Circuit has observed that "deciding qualified immunity at the summary-

judgment stage can be tricky." *Justiniano,* 986 F.3d at 27 (citing *Morelli v. Webster*, 552 F.3d

12, 18-19 (1st Cir. 2009)).  This is so as "'[t]he doctrinal intersection of qualified immunity

principles and summary judgment principles is not well mapped,' and '[p]lotting that intersection

can present thorny analytic problems – problems that are magnified because of the desire to

resolve claims of qualified immunity at the earliest practicable stage of litigation.'" *Id*.

(alterations in original) (quoting *Morelli*, 552 F.3d at 18).  The court has described the decision

as a "tug-of war . . . between who gets the benefit of the doubt: summary judgment 'requires

absolute deference to the nonmovant's factual assertions,' while qualified immunity 'demands

deference to the reasonable, if mistaken, actions of the movant.'" *Id*. (quoting *Morelli*, 552 F.3d

at 18-19).  The *Justiniano* court resolved this tension by "framing the factual events according to

summary judgment's traditional leeway to the nonmoving party's version of events, and then

asking whether, given that story, 'a reasonable officer should have known that his actions were unlawful.'" *Id.* (quoting *Morelli*, 552 F.3d at 19).

        2.     Framing the Factual Events

In support of his summary judgment motion, Marley frames the factual record as follows:

> Among all requests for well-being checks from 2014-2019, none except Hamilton's bears any similarity to the peculiar set of facts here, when an individual who had not seen or spoken with the subject of the call, who called the Dalton Police Department business line to share third-hand information about a person's mental health status, who (when contacted by police) not only did not request a well-being check and rescinded the request he had initially made to dispatch, but declined offers of a police response; and finally, where the only lawful owner of the premises and only percipient witness to the subject's mental health status also declined any police response.

(Dkt. No. 131 at 4).

Review of the parties' evidentiary submissions shows that, in contravention of the *Justiniano* standard, this account sets out the facts in the light most favorable to Marley and draws all possible inferences in his favor. Viewed in Plaintiff's favor as is required, the record would support a conclusion by a reasonable factfinder that Marley did not respond to the call for protective services for Sherilyn because he wanted to protect a fellow law enforcement officer. The evidence shows that after Hamilton spoke with Speth, Speth radioed Marley and Bencivenga, the officers on duty, telling them that he had received a call about a domestic dispute (DSOF ¶ 9; Pl. Resp. DSOF ¶ 9). Speth asked whether an officer could telephone him so he could give him additional information (DSOF ¶ 9; Pl. Resp. DSOF ¶ 9). Marley, who was in the police station, went to the dispatch office in person (DSOF ¶ 11; Pl. Resp. DSOF ¶ 11). Speth told Marley that the caller had asked for a well-being check, that Nutting, the male individual involved in the domestic situation, was a law enforcement officer from Peru, that his fiancée had threatened suicide during an argument, that there were weapons in the apartment,

and that Nutting was not at the residence (DSOF ¶ 12; Pl. Resp. DSOF ¶ 12; Dkt. No. 143-2 at 6). Marley's next step was to order Bencivenga to stand by (DSOF ¶ 21; Pl. Resp. DSOF ¶ 21). When Marley was not immediately able to reach Hamilton at the phone number Speth provided, he attempted to reach Nutting by calling Henault, who handed his cellphone to Nutting (DSOF ¶¶ 24, 26, 28; Pl. Resp. DSOF ¶¶ 24, 26, 28). Nutting confirmed to Marley that Sherlyn had said she wanted to die and that she had threatened to kill herself (Dkt. No. 143-4 at 6). Instead of responding to Sherilyn's and Nutting's apartment promptly after receiving this confirmation of the suicide threat directly from the individual to whom Sherilyn had voiced it, Marley called Bencivenga (Dkt. No. 142 at 72). Bencivenga did did not respond to the residence after this call (Dkt. No. 132-2 at 28-29; Dkt. No. 132-6 at 7).

At his deposition, Marley testified that he could not think of any other call involving a threat of self-harm to which he did not respond immediately (Dkt. No. 132-1 at 4-5). He further testified that he would have a reason to not respond immediately if he determined there was a need to take further investigative steps to determine if it was safe to respond (Dkt. No. 132-1 at 51-52; Dkt. No. 142 at 67). But a reasonable juror could conclude, contrary to Marley's suggestion, that his next conversation with Hamilton was not in aid of determining if it was safe to respond to Sherilyn's apartment but was instead focused on persuading Hamilton to withdraw his request for protective services for Sherilyn. The call was recorded, so it is undisputed that Marley did not ask about Sherilyn's mental health history, whether she had a criminal history, a history of violence, or access to weapons, or even whether she had made threats of self-harm in the past without following through, nor is there evidence that Marley asked Nutting or Hamilton for her telephone number and tried to reach her (Dkt. No. 132-15; Dkt. No. 142 at 159-60). A reasonable juror could find, based on the contents of the recorded conversation, that Marley

called with the intent of persuading Hamilton to withdraw the request for assistance, was focused

on that purpose during the call, and could further infer that Marley was motivated by a desire to

protect Nutting's job and reputation.  If Marley's goal was to persuade Hamilton to withdraw the

request for protective services, Marley was successful.  As Hamilton reported to Nutting, he

"called off the dogs" (DSOF ¶¶ 36, 48; Pl. Resp. DSOF ¶¶ 36, 48; Dkt. No. 132-6 at 10; Dkt. No.

132-14 at 4).  The DPD did not respond to Sherilyn's and Nutting's apartment until after the

department was notified that she had killed herself (DSOF ¶¶ 52, 53; Pl. Resp. DSOF ¶¶ 52, 53;

Dkt. No. 132-2 at 28-29).

A law enforcement officer's failure to comply with department guidelines may be a

factor in determining whether he is entitled to qualified immunity.  *See, e.g., Stamps v. Town of

Framingham*, 813 F.3d 27, 32-33 (1st Cir. 2016) (affirming the denial of qualified immunity for

police officer who did not comply with basic firearm safety procedures and departmental

guidelines).  The DPD guidelines for responding to calls for protective services classified calls

that involve imminent and actual danger of serious injury or death as level three emergency calls

that required an immediate response from DPD officers (Dkt. No. 142 at 12, 27, 94, 95).  The

guidelines provided that a condition that defines an emergency call is, among others, one that

posed any imminent threat to life or danger of serious physical injury (Dkt. No. 142 at 94, 95).

As the Rule 30(b)(6) witness for the Town, Deanna Strout, DPD Chief of Police, testified that a

call reporting that someone has threatened suicide was classified as a level three emergency code

requiring an immediate response to the scene (Dkt. No. 142 at 318).  A reasonable juror could

find that Marley's decision not to respond *at all* to Hamilton's call for services for someone who

had expressed a suicidal intention – an intention that was confirmed by Nutting to whom she

voiced the threat – was in violation of DPD's guidelines for responding to requests for protective services.[3]

There are, moreover, gaps and contradictions in Marley's records and statements about events that a factfinder could conclude appear misleading and self-serving, undermining his accounts about the facts and his claims about his motives and intentions.  Marley's police report – prepared after he knew Sherilyn had killed herself – indicated that Nutting told Marley that Nutting did not believe a well-being check was necessary (Dkt. No. 142 at 324).  Nutting has denied that he told Marley there was no need to check on Sherilyn's well-being (Dkt. No. 143-4 at 4).  After Nutting's conversation with Marley, Nutting believed that the DPD were on their way to the apartment to check on Sherilyn (Dkt. No. 143-4 at 2-3).  Further, contrary to the contents of Marley's police report, Speth, who was an experienced dispatcher, denied that he was confused or uncertain during the initial dispatch or in any communications with Marley (Dkt. No. 132-2 at 12, 22; Dkt. No. 142 at 324).  In addition, Marley's report about his conversation with Speth omitted the significant information that Speth confirmed Sherilyn's threat of self-harm (Dkt. No. 142 at 75, 324).  *Cf. Lucien-Calixte v. David*, 405 F. Supp. 3d 171, 178 (D. Mass. 2019) (the court gave weight to plaintiff's allegation that the defendant police officer's report omitted relevant information in ruling that the officer was not entitled to qualified immunity).

---

[3] In the opening pages of her brief, Plaintiff refers to Sherilyn as a victim of domestic violence inflicted by a police officer (Dkt. No. 142 at 3).  There is no evidence of a report of domestic violence on the day on which Sherilyn committed suicide, nor is there evidence of any history of prior reports to the DPD concerning confrontations, verbal or physical, between Sherilyn and Nutting, or any application by Sherilyn for a protection order.  Notwithstanding Plaintiff's arguments to the contrary, the DPD domestic violence policy is not relevant in this case. Further, to the extent Plaintiff continues to claim that Marley, or anyone employed by the Town, created or contributed to creating the risk to Sherilyn's life (Dkt. No. 142 at 1), that claim is wholly unsupported by the record.  The court dismissed Plaintiff's state-created danger claim at the Rule 12(b)(6) stage.  *Hayes*, 2022 WL 488466, at *5-7.

A finding that Marley chose to protect Nutting at Sherilyn's expense is by no means compelled on the summary judgment record. However, "framing the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events," *Justiniano*, 986 F.3d at 27, there is sufficient evidence in this record to support such a finding by a jury. *Cf., e.g., Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 55 (1st Cir. 2021) (stating, in reversing a summary judgment, that "[t]he fact that a jury would not be compelled to find a statement was direct evidence of discrimination does not make it inherently ambiguous so long as a jury could conclude it was."). The court, therefore, moves to the questions of whether Marley's conduct in denying Sherilyn access to protective services violated a clearly established constitutional right against selective law enforcement and "whether, given that story, 'a reasonable officer should have known that his actions were unlawful.'" *Justiniano*, 986 F.3d at 27 (quoting *Morelli*, 552 F.3d at 19).

> 3.    Clearly Established Law and Objectively Reasonable Conduct

While "[i]t is clearly establishe[d] that the state does not have a constitutional duty to protect its citizens from private violence," *Soto v. Flores*, 103 F.3d 1056, 1063 (1st Cir. 1997) (citing *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989)), it is also well-established that a state is not entitled to "deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney*, 489 U.S. at 197 n.3. "Law enforcement officers therefore may not selectively deny protective services based on 'invidious classifications such as race, gender, and religion.'" *Noka v. Town of Charlestown*, 524 F. Supp. 3d 9, 13 (D.R.I. 2021) (quoting *Pariseau v. City of Brockton*, 135 F. Supp. 2d 257, 262-63 (D. Mass. 2001)); *see also Hayden v. Grayson*, 134 F.3d 449, 452, 453 n.3 (1st Cir. 1998). Here, Plaintiff does not claim that Sherilyn was denied protective services based on

membership in a class of disfavored persons.  Rather, her claim is that Marley violated Sherilyn's right to equal protection by choosing not to respond to a dispatch notifying him of a life-threatening emergency so as to protect a fellow law enforcement officer from potential negative repercussions (Dkt. No. 142 at 3).  Because Plaintiff does not claim to be a member of a disfavored class of persons to whom Marley refused services in favor of protecting fellow law enforcement officers, Plaintiff advances what is known as a "class of one" equal protection claim.

 "As the Supreme Court has recognized, a plaintiff can bring an equal protection claim as a 'class of one' even where the plaintiff does 'not allege membership in a class or group.'" *Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 130 (1st Cir. 2023) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).  "In a class-of-one claim, the plaintiff must show that 'she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Id.* (quoting *Olech*, 528 U.S. at 564).  In the First Circuit, a majority of class-of-one claims have arisen in the context of selective enforcement of land use restrictions.  For example, in *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 32-33 (1st Cir. 2008), the plaintiff landowners claimed that the town had intentionally and wrongfully singled them out for adverse enforcement action while the town did not take action against other similarly situated landowners.  The First Circuit held that the complaint stated a class-of-one equal protection claim because the plaintiffs had adequately alleged that the defendant Commission selectively enforced environmental obligations against the plaintiff landowners and not against other similarly situated landowners and was motivated by an intent to injure.  *Id.* at 35.  The First Circuit has acknowledged the possibility of an equal protection claim based "upon alleged selective denial of protection" by law enforcement,

*Melendez-Garcia v. Sanchez*, 629 F.3d 25, 38 (1st Cir. 2010) (citing *Hayden*, 134 F.3d at 452), and, in *Hayden*, the court observed, albeit in a footnote, that "[t]he Equal Protection Clause safeguards not only against such invidious classifications as race, gender and religion, but any arbitrary classification of persons for unfavorable governmental treatment," *Hayden*, 134 F.3d at 453 n.3, but Plaintiff has not identified any First Circuit case in which a class-of-one equal protection claim based on selective withholding of law enforcement protection has reached the summary judgment stage and, so far as the court is aware, there are none.

This gap, however, does not preclude the possibility that Plaintiff's right to equal protection in the provision of protective law enforcement services was clearly established by 2019 when the events at issue in this case took place. The First Circuit recently observed that "[t]he Supreme Court has . . . explained that '"general statements of the law are not inherently incapable of giving fair and clear warning"' to officers." *Segrain v. Duffy*, 118 F.4th 45, 57 (1st Cir. 2024) (quoting *White v. Pauley*, 580 U.S. 73, 79-80 (2017) (per curiam) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))). The First Circuit has "made clear that [the Court] may 'look[] to the case law of sister circuits in determining whether a right was clearly established.'" *Wadsworth v. Nguyen*, 129 F.4th 38, 59 (1st Cir. 2025) (second alteration in original) (quoting *McCue v. City of Bangor*, 838 F.3d 55, 63 (1st Cir. 2016)). Further, "'[a] plaintiff need not find an identical case concluding that a constitutional violation occurred.'" *Segrain*, 118 F.4th at 57 (alteration in original) (quoting *Penate v. Sullivan*, 73 F.4th 10, 18 (1st Cir. 2023))*; see also Wadsworth*, 129 F.4th at 59. "However, 'in light of pre-existing law the unlawfulness must be apparent.'" *Segrain,* 118 F.4th at 57 (quoting *White*, 580 U.S. at 79-80).

Circuit courts, including the First Circuit, have long held that a plaintiff states an equal protection claim when she alleges that a police department has a policy or practice of providing

less protection to victims of domestic abuse than to other assault victims for discriminatory

reasons. *See, e.g., Soto*, 103 F.3d at 1066 (collecting cases from other circuits). In *Shipp v.*

*McMahon*, 234 F.3d 907 (5th Cir. 2000), *cert. denied*, 532 U.S. 1052 (2001), *overruled on other*

*grounds by McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002), the Fifth Circuit

adopted the standard articulated in *Soto* for equal protection claims based on allegations that

police officers treated victims of domestic abuse differently than victims of non-domestic

assault. *Id.* at 913-14. The *Shipp* court further held that, in the case before it, the defendant

police officers were entitled to qualified immunity because the right to equal protection was not

clearly established when law enforcement officers failed to protect the victim-plaintiff in the case

before the court. *Id.* at 912-15.

At the same time, the Fifth Circuit went a step further and remanded the case with an

instruction to the district court to permit plaintiffs to file an amended complaint asserting a class-

of-one equal protection claim based on the allegation that the mother-in-law of the plaintiff-

victim, who was employed by the police department, might have influenced the department's

response to her daughter-in-law's repeated requests for protection from her abusive police officer

husband. The Fifth Circuit held that if the victim-plaintiff could plead facts to show that she had

received unequal police protection "'for reasons of a personal nature unrelated to the duties of

the defendant's position,'" *id.* at 916 (quoting *Hilton v. Wheeling*, 209 F.3d 1005, 1008 (7th Cir.

2000)), "[she] may be able to establish an unequal police protection claim within the framework

elucidated in *Village of Willowbrook v. Olech*." *Id.* at 917. Similarly, in 2008, in *Phillips v. Cty.*

*of Allegheny*, 515 F.3d 224 (3d Cir. 2008), the Third Circuit concluded that the plaintiff had

failed to allege that her decedent was treated differently than similarly situated individuals, but

remanded the case to the trial court to permit the plaintiff to amend her complaint to remedy the

25

deficiency. *See id.* at 245-46.  In *Phillips*, dispatchers working for the county assisted a dispatcher, who had been fired, to gain access to private information in the county's 911 database, knowing that the fired dispatcher was looking for information about the locations of his former girlfriend and her significant other.  Plaintiff sought to assert a class-of-one equal protection claim on behalf of her son, who was murdered by the fired dispatcher.  *See id.* at 228-29.  The Third Circuit remanded the case to the district court to permit plaintiff to amend the complaint to assert that her deceased son was treated differently than other individuals whose private information was in the county's 911 database and was not illegally accessed.  *See id.* at 243-46.

Cases decided by courts in other circuits have further discussed and defined the essential elements of class of one equal protection claims when a plaintiff alleges that they received unequal protection or were the target of unequal law enforcement for reasons that lacked a rational basis and were for improper reasons unrelated to the duties of the defendant law enforcement officer.  The Seventh Circuit has addressed this question repeatedly and exhaustively.  In *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), the plaintiff received 24 bogus parking tickets over 14 months, all written by the same police unit.  *Id.* at 745.  The Seventh Circuit held that he had stated a class-of-one equal protection claim because, "[a]bsent a reasonable explanation . . . the pattern adds up to deliberate and unjustified official harassment that is actionable under the Equal Protection Clause . . . ."  *Id.*  Subsequently, in *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc) (per curiam), the Seventh Circuit was unable to agree on a majority approach to the standard of liability for class-of-one claims of selective improper discriminatory treatment by law enforcement.  *Id.* at 889.  The opinion of the five judges who voted to affirm dismissal of the complaint was authored by Judge Posner, who

surveyed the landscape of class-of-one litigation, noting considerable support for the Seventh

Circuit's standard adopted in *Hilton* in 2000, in which the court held that "'to make out a prima

facie case the plaintiff must present evidence that the defendant deliberately sought to deprive

him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of

the defendant's position.'" *Id.* at 891-92 (quoting *Hilton*, 209 F.3d at 1008) (collecting cases).

In *Del Marcelle*, Judge Posner announced a variant of the *Hilton* standard, which was that a

"plaintiff must plead and prove *intentional discriminatory treatment* that *lacks any justification*

*based on public duties* and that there be some *improper personal motive* for the discriminatory

treatment." *Id.* at 899. An opinion authored by Judge Wood, in which four additional judges

joined, posited that

> a plaintiff seeking to present a class-of-one case must include in his or her
> complaint plausible allegations about the following elements: (1) plaintiff was the
> victim of intentional discrimination, (2) at the hands of a state actor, (3) the state
> actor lacked a rational basis for so singling out the plaintiff, and (4) the plaintiff
> has been injured by the intentionally discriminatory treatment. In so doing, the
> plaintiff must present facts – not bare legal conclusions – that support these
> points.

*Id.* at 913 (Wood, J., dissenting).

Relying on this authority, district courts in the Seventh Circuit have denied summary

judgment to police officers in class-of-one equal protection claims based on selective

enforcement or provision of services by law enforcement. *See Snyder v. Smith*, 7 F. Supp. 3d

842, 861-66 (S.D. Ind. 2014) (denying summary judgment for police officer defendants when

plaintiff, a sexual assault victim, alleged that the officers treated her with scorn and did not

investigate the sexual assault because the officers had close personal connections to the alleged

perpetrators of the assault); *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 947-49 (N.D. Ill.

2014) (denying summary judgment for the defendant police officer on plaintiff's class-of-one

equal protection claim when the officer issued plaintiff 33 parking tickets over some three months, starting two days after the plaintiff's arrest).  In *Snyder*, the court further held that the defendant officers were not entitled to qualified immunity because "binding Seventh Circuit precedent at the time established that 'withholding all police protection' from a plaintiff, at least when prompted by invidious personal motives, violated the Constitution."  *Snyder,* 7 F. Supp. 3d at 866 (citing *Hanes v. Zurick*, 578 F.3d 491 (7th Cir. 2009)*; Hilton*, 209 F.3d at 1007).

Courts in other circuits have also endorsed class-of-one claims asserting injuries based on allegedly discriminatory and irrational law enforcement responses to calls for protective services, generally in the emergency context.  Plaintiff relies on *Dalton v. Reynolds*, 2 F.4th 1300 (10th Cir. 2021), in which the plaintiff unsuccessfully sought police protection from her abusive husband, who was employed by the police department.  *Id.* at 1305-06.  Officers failed to comply with the department's domestic violence policy, which had resulted in arrests of assailants in 140 out of 149 cases in the year in which the plaintiff was murdered.  *Id.* at 1307.  The court held, first, that police officers had treated the plaintiff differently by depriving her of protective services based on a non-suspect classification, that being spouse of a police officer, and second, that there was no rational basis for the difference in treatment.  *Id.* at 1309-10.  Thus, the court held, a reasonable jury could find that the officers had violated the plaintiff's constitutional right to equal protection.  *Id.* at 1310.

Because the *Dalton* case post-dates Sherilyn's death, this court cannot rely on it as contributing to a robust consensus of precedent that would have alerted Marley that it would be unconstitutional to withhold protective services for the purpose of protecting a fellow law enforcement officer.  *See Eves*, 927 F.3d at 582-83 (citing *Wesby,* 583 U.S. at 63).  The case is nonetheless relevant to the clearly established analysis in that, in *Dalton*, the Tenth Circuit

rejected the officers' assertion of a qualified immunity defense because, by 2016, when the plaintiff was murdered, it was clearly established "that it is unlawful to provide less police protection to a sub-class of domestic violence victims, like those whose assailants were police officers with whom they had been in a domestic relationship." *Dalton,* 2 F.4th at 1311. In reaching this conclusion, the court relied on *Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir. 1988), in which the court held that providing less police protection to victims of domestic violence than to victims of non-domestic violence could be the basis of an equal protection violation, *id.* at 695-96, and *Price-Cornelisian v. Brooks*, 524 F.3d 1103 (10th Cir. 2008), in which the court affirmed the denial of qualified immunity to a police officer who, the lesbian plaintiff alleged, discriminated against her by refusing to enforce her permanent protective order the way he had enforced a permanent protective order obtained by a heterosexual victim of domestic violence, *id.* at 1111, 1114-15. *See Dalton,* 2 F.4th at 1311. In a similar vein, in *Brent v. City of Cumberland Police Dept.*, 700 F. Supp. 3d 314 (D. Md. 2023), reviewing Fourth Circuit precedent, the district court judge held, based on that precedent, that "as of 2005, class-of-one claims [beyond the easement context] were sufficiently clearly established to warn the Defendants about the unlawfulness of their conduct." *Id.* at 321-22 (citing *Ruttenberg v. Jones*, 283 F. App'x 121, 131 (4th Cir. 2008); *Willis v. Town of Marshall*, 426 F.3d 251 (4th Cir. 2005); *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328-29 (4th Cir. 2005); *C & H Co. v. Richardson*, 78 F. App'x 894, 901 (4th Cir. 2003); *Tri-Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 439-40 (4th Cir. 2002)). The *Brent* court denied the defendant police officers' motion for summary judgment based on qualified immunity where the plaintiff claimed that she was denied 911 assistance for calls about misconduct by her neighbors because police officers were friendly with the plaintiff's neighbors. *Id.* at 317, 321-23. In addition, while not in

a class-of-one context, in 2010, the Ninth Circuit Court of Appeals denied judgment to police

officers based on their claim of qualified immunity on the ground that "[t]he right to non-

discriminatory administration of protective services [wa]s clearly established." *Elliott-Park v.*

*Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010).[4]

In arguing for qualified immunity, Marley relies on *Sargent v. Town of Hudson*, Civil No.

14-cv-509-AJ, 2017 WL 4355972 (D.N.H. Sept. 27, 2017), in which the court held that it was

not clearly established in 2011 that police officers could provide less protection to a victim of

domestic violence due to her abuser's relationship with law enforcement than they would to

other victims of domestic violence. *Id.* at *9-10.  This court respectfully disagrees.  As the judge

in *Sargent* acknowledged, "[t]here is a long line of Supreme Court and First Circuit precedent

recognizing class-of-one claims challenging certain types of governmental action." *Id.* at *9

(citing *Bank Markazi v. Peterson*, 578 U.S. 212, 234 n.27 (2016); *Olech*, 528 U.S. at 564; *Najas*

*Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 144 (1st Cir. 2016); *Snyder v. Gaudet*, 756

F.3d 30, 34 (1st Cir. 2014)).  Controlling precedent in the First Circuit established in 1997 that a

victim of domestic violence stated a claim for violation of her constitutional right to equal

protection when she produced sufficient evidence to show that a police force had a custom or

policy of providing less protection to female victims of domestic violence that to other assault

victims.  *Soto*, 103 F.3d at 1066 (citing *Watson*, 857 F.2d at 694).  Relying on the same

precedent on which the First Circuit relied in deciding *Soto*, the Tenth Circuit held in *Dalton*

that, by 2016, it was clearly established that it was a violation of the constitutional right to equal

---

[4] The court acknowledges that Plaintiff cited little of this authority in support of her argument
against qualified immunity.  "This is of no matter, however, as, '[i]n conducting a qualified
immunity analysis, a court should "use its full knowledge of its own [and other relevant]
precedents."'"  *Wadsworth*, 129 F.4th at 59 n.12 (alterations in original) (quoting *Barton v.*
*Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994))).

protection to deny protective services to an individual whose domestic partner was a police officer. *Dalton*, 2 F.4th at 1311 (citing *Watson*, 857 F.2d at 694). This is what Plaintiff asserts Marley did.[5]

In *Soto* and similar cases in other jurisdictions, courts have held that police officers could not selectively withhold protective services because of invidious discrimination based on the race, gender, or religion of the individual seeking protection. *See, e.g., Noka*, 524 F. Supp. 3d at 13. In the land use restriction class-of-one equal protection cases in the First Circuit, the court has required that a plaintiff sufficiently allege and prove that the defendant(s) acted "'based on impermissible considerations such as . . . malicious or *bad faith* intent to injure a person.'" *SBT Holdings, LLC*, 547 F.3d at 34 (alteration in original) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The motivation element required in equal protection cases, including class-of-one equal protection cases, is intended to function as a limiting principle that will identify "amidst the welter of trivial 'irrationalities' in discretionary functions by frontline public employees acts of discrimination of a character to warrant classification as denials of equal protection." *Del Marcelle*, 680 F.3d at 891, 894. The requirement that a plaintiff plausibly

---

[5] Marley's qualified immunity argument includes a brief reference to *Flowers v. City of Minneapolis*, 558 F.3d 794 (8th Cir. 2009), in which the Eighth Circuit held that "while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim." *Id.* at 799-800. The decision in *Flowers* was based on *Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591 (2008). "In *Engquist*, the Supreme Court identified one sphere – public employment – in which plaintiffs cannot bring class-of-one equal protection claims at all. It did not purport to alter the analytical framework of class-of-one claims that *can* be pursued in other contexts. On the contrary, *Engquist* expressly preserved the class-of-one framework set forth in *Olech*." *Back Beach Neighbors Comm.*, 63 F.4th at 132 (footnote and citation omitted). It does not appear that the First Circuit has thus far accepted the limitation on class-of-one equal protection claims adopted by the Eighth Circuit following the *Engquist* decision.

allege, then show, that a law enforcement officer acted for an impermissible or invidious reason unrelated to his duties addresses the need for a limiting factor.

The cases discussed above do not present factual scenarios that are identical to the scenario that is the basis of Plaintiff's claims. However, "identicality is not required." *Wadsworth*, 129 F.4th at 60. The cases provide, as a general statement of law, that law enforcement officers may not treat similarly situated individuals differently when there is no rational basis for the different treatment and where such different treatment is motivated by an invidious purpose unrelated to the duties of the officer. *See Hilton*, 209 F.3d at 1008. Marley, as a DPD officer, was presented with credible and uncontradicted information from two knowledgeable sources that Sherilyn's life was at risk by suicide. Hamilton told Marley that Sherilyn had not responded to attempts to reach her. A jury could find, based on the conversation between Marley and Hamilton, that Marley knew he was required by DPD guidelines to respond to Sherilyn's apartment unless he could persuade Hamilton to withdraw the request for protective services, and that he worked to persuade Hamilton to withdraw his request for services so as to protect Nutting at Sherilyn's expense (Dkt. No. 132-15; Dkt. No. 142 at 159-60). Assuming Marley did so, "a reasonable [law enforcement officer] would understand that the described conduct would violate [Sherilyn's] constitutional rights." *Wadsworth*, 129 F.4th at 66.

Having found that Marley is not entitled to qualified immunity at the summary judgment stage in light of the factual record, the court turns to his remaining contentions on the basis of which he seeks summary judgment.

### 4.    Similarly Situated Comparators

Marley argues that Plaintiff has not adequately shown that she was treated differently than other similarly situated comparators (Dkt. No. 131 at 3-4). "[I]n class-of-one cases where

the plaintiff alleges that they were singled out for unfavorable treatment based on their own unique – and unprotected – characteristic, 'proof of a similarly situated, but differently treated, comparator is essential.'" *Wadsworth*, 129 F.4th at 73 n.20 (Rikelman, J., concurring) (quoting *Snyder*, 756 F.3d at 34; citing *Olech*, 528 U.S. at 564). "Courts have understood that if class-of-one claims are not defined appropriately, they might turn many ordinary and inevitable mistakes by government officials into constitutional violations and federal lawsuits.  One element of a proper class-of-one claim is a wrongful act that necessarily involves treatment departing from some norm or common practice." *Geinosky*, 675 F.3d at 747.

Plaintiff has not provided comparator evidence by identifying a specific individual who was similarly situated but treated differently than her decedent.  Rather, her evidence comes in the form of testimony from DPD Chief Strout, who testified as the Town's Rule 30(b)(6) deponent about the DPD's policies and practices.  Chief Strout, who had been a DPD officer for some twenty-five years, testified that there was no justification for a DPD officer failing to respond immediately when dispatched in response to a call about someone who had made threats of suicide (Dkt. No. 142 at 318).  She testified that as far as she was aware, Sherilyn's threat of suicide was the only such situation that involved a law enforcement officer, and that this was the only occasion of which she was aware in which the DPD did not respond immediately to a call notifying the DPD about a threat of suicide (Dkt. No. 142 at 318, 319-20).  For his part, Marley testified that he could not think of any call involving a threat of self-harm other than the call asking for protective services for Sherilyn to which he did not respond immediately (Dkt. No. 132-1 at 4-5).  Thus, Plaintiff identifies as comparators those other subjects of calls for protective services based on a threat of suicide for whom Marley admittedly provided an immediate response.

There are cases in which similar evidence has been accepted as sufficient to establish that a plaintiff was treated differently than other similarly situated individuals. In *Mathers v. Wright*, 636 F.3d 396 (8th Cir. 2011), the plaintiff asserted a class-of-one equal protection claim on behalf of her disabled child, J.S.J. Plaintiff alleged that the defendant, J.S.J.'s teacher, refused to teach J.S.J., isolated her during recess and fire drills, and made her crawl on the floor. *Id.* at 400. The court rejected the defendant's argument that the plaintiff had failed to identify similarly situated comparators, stating that the plaintiff's claim was that the defendant "singled out J.S.J. from other students in her class. These students are similarly situated by virtue of being taught by [the defendant]. It is J.S.J.'s experience as a student as such . . . that defines the ground of comparison on which her equal protection claim rests. . . . Accordingly, the record does not support [the defendant's] contention that [the plaintiff] failed to identify a class of similarly situated individuals." *Id.* In *Frederickson v. Landeros*, 943 F.3d 1054 (7th Cir. 2019), the court denied the defendant police officer's motion for summary judgment based on qualified immunity on plaintiff's class-of one equal protection claim where the plaintiff alleged that the defendant had obstructed his efforts to satisfy his obligation to register as a sex offender. *Id.* at 1057-59. As evidence that the plaintiff was treated differently than similarly situated comparators, the court relied on the fact that "[n]o law enforcement officer could recall similar obstruction happening in his experience." *Id.* at 1062. The existence of similarly situated comparators finds strong support in the testimony from Chief Strout and from Marley himself.

Marley's argument that Plaintiff cannot show that Sherilyn was similarly situated to others based on the particulars of the call for emergency protective services is unpersuasive (Dkt. No. 131 at 4). First, his argument relies impermissibly on a recitation of facts viewed in the light most favorable to Marley. A reasonable juror could find that Nutting did not decline a police

response, that Hamilton withdrew his request for protective services because Marley pressured him to do so, and that Marley mischaracterizes the call as one based on Sherilyn's mental health status rather than on a reliable report of a threat of self-harm (Dkt. No. 131 at 4).  Second, Marley's claim that Hamilton's call for services differed from other calls for protective services in ways that undermined its reliability is unsupported by reliable record references (Dkt. No. 131 at 4).

Marley's reliance on the DPD call logs is similarly unavailing (Dkt. No. 132-11).[6]  DPD guidelines for responding to calls for services provides that "[t]he manner in which officers respond to calls must vary according to the nature and severity of the call.  This is necessary to ensure the maximum safety of the general public and to the officers themselves" (Dkt. No. 132-18 at 2).  To the extent Plaintiff relies on Marley's decision to have an initial conversation with Speth as evidence of different treatment, the DPD guidelines acknowledge that an officer has discretion to take reasonable investigative steps in connection with responding to a call for protective services.  Speaking with Speth could be found to qualify as such a reasonable investigative step.  Assuming for the sake of argument that Marley needed to take any further investigative steps after his conversation with Speth, Marley next received confirmation from Nutting, a percipient witness, that Sherilyn had threatened suicide (DSOF ¶ 29; Pl. Resp. DSOF ¶ 29; Dkt. No. 143-4 at 6).  He has not pointed to any other call for services in which, having received information from a dispatcher and a percipient witness about a credible threat of suicide and having absolutely no reason to believe that the person was safe, he did not immediately proceed to the scene.  Such a contention is inconsistent with his deposition testimony.  Nor has he pointed to any other call for services for a suicidal individual in response to which he

---

[6] The court has stricken Marley's exhibit 17 and does not consider its contents.

pressured the individual who requested services to withdraw his request for a police response. "[T]he ultimate determination as to whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill." *Cordi-Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir. 2007). Giving due weight at the summary judgment stage to the testimony of Chief Strout and Marley, there is at least a dispute of material fact as to whether Marley treated Plaintiff's decedent differently than he treated other similarly situated individuals.

Finally, Marley argues that Plaintiff has not sufficiently shown a lack of a rational basis for his failure to respond to Hamilton's call for services. "Absent a classification triggering strict scrutiny, the court will deploy rational basis review, which is generally deferential to the government actor." *N. End Chamber of Commerce v. City of Boston*, Civil No. 24-10039-LTS, 2024 WL 5197557, at *10 (D. Mass. Dec. 20, 2024), *appeal docketed sub nom. N. End Chamber of Commerce, Inc. v. City of Boston,* No. 25-1063 (1st Cir. Jan. 17, 2025). "'Under rational basis scrutiny a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational.'" *D'Angelo v. N.H. Sup. Ct.*, 740 F.3d 802, 806 (1st Cir. 2014) (quoting *LCM Enters., Inc. v. Town of Dartmouth,* 14 F.3d 675, 679 (1st Cir. 1994)). Marley argues that it was rational to proceed with caution because there were weapons in the apartment, because Sherilyn was "mentally ill" and was "more likely to respond unpredictably and negatively to police presence" and because he had a concern about the constitutionality of entering the apartment without consent (Dkt. No. 131 at 10).

Here too Marley's contentions rely on viewing the evidence in the light most favorable to him and drawing all plausible inferences (and some that seem implausible) in his favor. A juror could find that the record does not show that Marley's purported investigative steps were for the

purposes of gaining additional information about weapons in the apartment or about Sherilyn's mental health status because he made no inquiries about those subjects during his calls after Hamilton's initial call for services.  As to Fourth Amendment concerns, so far as appears from the record, Marley did not ask Nutting for permission to enter the apartment and Marley told Hamilton that "for us to go there and either force our way into that home or to take her into custody, we need someone to tell us that that's what they're asking us to do" (Dkt. No. 132-1 at 50; Dkt. No. 132-15; Dkt. No. 142 at 159-60).  The record does not support that Marley sought leave to enter the apartment or was weighing concerns about the constitutionality of entering.  As is set forth above, a reasonable jury could find that Marley did not respond to Hamilton's call for protective services because Sherilyn's fiancé was a law enforcement officer.  Marley has "offered no rational reason to decline police protection to certain [individuals at risk of suicide] but to afford it to others" and none is readily apparent.  *Dalton*, 2 F.4th at 1309.

Marley's request for summary judgment on Count II is denied.

D.    State Law Claim:  Gross Negligence or Recklessness against Marley in his Individual Capacity (Count VI)

Although Count VI is captioned "gross negligence" Plaintiff alleges that Marley is individually liable for Sherilyn's death because he "acted in a manner so reckless . . . as to demonstrate substantial lack of concern as to whether injury or death would occur and, as such, are [sic] not protected by governmental immunity" (Compl. ¶ 107).  Marley argues that he is immune from personal liability under the Massachusetts Tort Claims Act ("MTCA") (Dkt. No. 131 at 30).

"Under the MTCA, public employees who commit 'negligent or wrongful' acts or omissions 'while acting within the scope of [their] office or employment' are immune from liability."  *Doyle v. City of Quincy*, 245 N.E.3d 1053, 1057 (Mass. App. Ct. 2024) (alteration in

original) (quoting *Berry v. Commerce Ins. Co.*, 175 N.E.3d 383, 387 (Mass. 2021) (quoting G. L. c. 258, § 2)). "Instead, unless a statutory exemption applies, . . . public employers may be held liable for injuries caused by the negligent or wrongful acts or omissions of their employees acting within the scope of their office or employment . . . ." *Id.*

An employee's acts of gross negligence and recklessness fall within the scope of the limits on the extent of the MTCA's waiver of sovereign immunity. *See id.* ("The immunity afforded to public employees by G. L. c. 258, § 2, encompasses claims for negligence, gross negligence, and reckless conduct."). Consequently, as a public employee, Marley is immune from individual liability for the claim raised in Count VI and is entitled to summary judgment as a matter of law. *See Cox v. City of Boston*, 734 F. Supp. 3d 173, 182 n.11 (D. Mass. 2024) (quoting *Schenker v. Binns*, 466 N.E.2d 131, 131 (Mass. App. Ct. 1984)); *Maraj v. Massachusetts*, 836 F. Supp. 2d 17, 31 (D. Mass. 2011) ("[T]he MTCA categorically protects public employees acting within the scope of their employment from liability for 'personal injury or death' caused by their individual negligence.") (quoting Mass. Gen. Laws ch. 258, § 2)).

This is a difficult and close case on summary judgment. The loss of Sherilyn's life was tragic. But, notwithstanding Plaintiff's rhetoric, neither the Town nor Speth or Marley created, contributed to, or enhanced the risk to Sherilyn's life. Nor is this a case in which a Town and its officers repeatedly denied an abuse victim whose significant other was a police officer the police protection that was afforded to other domestic violence victims to protect the victim's police officer spouse. *Contrast, e.g., Dalton*, 2 F.4th at 1304-05. Nonetheless, what was lost by Marley's failure to respond to Hamilton's call for protective services was the possibility that a timely police intervention might have saved Sherilyn's life. It may be that the question is not free from doubt in the First Circuit, but it is difficult to conclude that in 2019 an objectively

reasonable law enforcement officer would not have known that he could not lawfully deny protective services to Sherilyn for the purpose of avoiding possible adverse consequences to her law enforcement fiancé. *See Irish*, 979 F.3d at 76 ("'[T]he relevant question is what a well-trained officer would have thought about the lawfulness of *that* action.'" (alteration in original) (quoting *Rainsberger v. Benner*, 913 F.3d 640, 652 (7th Cir. 2019)); (citing *Hope v. Pelzer*, 536 U.S. 730. 741 (2002)). Whether Plaintiff has evidence sufficient to establish that police intervention could have helped by the time Hamilton requested protective services remains to be tested at a *Daubert* hearing in advance of trial.

IV.    Conclusion

For the foregoing reasons, Marley's Motion for Summary Judgment (Dkt. No. 130) is denied as to Count II and granted as to Count VI, Plaintiff's Motion to Strike Marley's Requests for Admissions (Dkt. No. 144) is granted, and Marley's Motion to Strike (Dkt. No. 147) is denied in part, and granted in part, as described herein. The Clerk's Office is directed to set a date for a status conference for the remaining parties to the case.

Dated: March 25, 2025                    Katherine A. Robertson
                                         KATHERINE A. ROBERTSON
                                         U.S. MAGISTRATE JUDGE